# STATE v. JOHN PANKRATZ.[1]

March 13, 1953.

No. 35,860.

[1]Reported in 57 N. W. (2d) 635.

*Austin L. Grimes* and *G. Harmon Klemme,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Lowell J. Grady,* Assistant Attorney General, and *Attell P. Felix,* for the State.

KNUTSON, JUSTICE.

Defendant was convicted of the crime of manslaugter in the second degree. He appeals from the judgment and the sentence imposed thereon.

In order to understand the facts related herein it is necessary to have in mind the respective locations of several places involved. The village of Genola is approximately 1 7/10 miles south of the village of Pierz, in Morrison county. Both villages are located on highway No. 218. At a point approximately a quarter of a mile south of the southerly limits of Pierz, highway No. 27, running east and west, intersects highway No. 218. Both highways are tarvia-surfaced. About 13 miles to the west of this intersection, Little Falls is located. State aid road No. 8 runs northwesterly from Genola, intersecting highway No. 27 at a point about 4/10 of a mile west of highway No. 218. It is a graveled road. Continuing north from the intersection of state aid road No. 8 and highway No. 27 is a rather narrow township road. State aid road No. 8 runs approximately at right angles to highway No. 27. Highway No. 218, on the other hand, runs at an angle to highway No. 27. The result is that these highways, from the intersection of Nos. 218 and 27 south to Genola and then back along state aid road No. 8 to its junction with No. 27 and easterly along No. 27 to the junction with No. 218, form a sort of a triangle. Laura Brausen, the deceased, lived between highway No. 218 and state aid road No. 8 at the southerly angle of the triangle described. There was a road leading to her home from highway No. 218 and one also from state aid road No. 8. The most direct route from Pierz to Genola is along highway No. 218.

Defendant, his wife, and their children came to Morrison county in December 1950 and thereafter lived on a farm near the village of Buckman. Buckman is located a short distance south of Genola,

also on highway No. 218. On the afternoon of July 23, 1951, defendant went to Buckman to attend to some business connected with his farming. While he was there he had two or three drinks of whiskey and a couple of bottles of beer. He returned home that evening, taking two boys with him who helped him with his chores. At the trial, he testified that he then ate his supper; at the coroner's inquest, he testified that he did not know whether he ate his supper or not. In any event, after finishing his chores he changed his clothes and then drove to Buckman, where he left the two boys who had helped him with his chores. He then drove to the village of Genola, where he entered Buddy's Bar, a liquor store, about 8 p. m.

A short time later the deceased, Laura Brausen, her cousin, Leroy Brausen, whom they called Bobby, and another young man, Arthur J. Preimesberger, entered the liquor store. Defendant knew Leroy Brausen and spoke to him when he entered. He was not acquainted with Preimesberger or Laura Brausen. At first, defendant and Leroy were at one end of the bar and the other two were at the other end. Defendant was shaking dice for pints of whiskey and in that way acquired four pints, one of which he later sold to Preimesberger. Defendant and Leroy Brausen had one drink of whiskey and then joined the other two, at which time defendant was introduced to Preimesberger and Laura Brausen. Defendant bought another drink of whiskey for himself and Leroy Brausen and a bottle of beer for the other two. Then they discussed going to a dance. Defendant testified that Laura then asked if she could change her clothes on the way to the dance but did not mention where she lived. Leroy Brausen testified that Laura went home and changed her clothes before they went into the liquor store. In any event, they left the liquor store and, without stopping at the home of Laura Brausen, went to Little Falls in defendant's car. Defendant drove and Leroy sat in the front seat with him. Laura and Preimesberger occupied the back seat. Defendant was directed to the home of another girl, Donna Lee Gammon, with whom Leroy had been keeping company. Upon their arrival there, Leroy and

Laura entered the Gammon house. Laura borrowed some clothing from Miss Gammon and changed into it in her home. Preimesberger testified that while the other two were in the Gammon house defendant said to him: "Bob is going to pick up a girl for me, too" and that he also said, "Probably there is enough there for both of us." They left the Gammon home with Leroy driving the car. Miss Gammon sat next to him, and defendant was next to her in the front seat. Laura and Preimesberger again occupied the back seat.

They then went to the home of Mr. and Mrs. Bud Zyvoloski. Mrs. Zyvoloski is a sister of Leroy Brausen. There they drank some more whiskey and played the piano. Defendant asked the girls to dance with him, but they refused. Witnesses called by the state testified that defendant tried to pull Laura up from her chair so that she would dance with him but that she pushed him away. This is denied by defendant. Donna Lee Gammon testified that while they were at the Zyvoloski home defendant "kept asking Leroy when he was going to pick him up a girl; he wanted a girl friend, too."

The party left the Zyvoloski home about midnight. They returned to the Gammon home. Donna Lee testified that on the way home defendant put his arm around her and said "Whose girl are you, Bobby's or mine?" and that she answered "Not yours" and pulled away from him. Defendant denied such conversation. Donna Lee and Leroy entered the house first and Laura later went into the house. Donna Lee said that when Laura came into the house she said: "That darn fool pulled my leg," and that Donna said "Well, who do you mean," to which Laura answered "That Pankratz." Defendant denies ever having pulled Laura's leg. After entering the Gammon house, Laura changed back into her own clothes in the presence of Donna. She was then wearing a sweater, a pair of blue jeans, a beaded belt, a brassiere, a pair of socks, shoes, underpants, and a sanitary pad. She had two combs in her hair, was wearing a wrist watch, and had a ring on her finger. According to Donna, none of her clothing was dirty, soiled, or torn.

The group stayed at the Gammon home about 15 minutes. They then left to return home. On the way home Leroy Brausen drove the car. Defendant occupied the front seat with him, and Laura and Preimesberger again occupied the back seat. On the way to Pierz, they told some dirty stories and sang some dirty songs. When they arrived at Pierz, Leroy Brausen drove to his home. He then gave the keys to his car, which he had left at Genola, to Preimesberger and asked him to take Laura home and then bring Leroy's car back. Preimesberger said that he would do so. Defendant then drove his car to the Preimesberger home in Pierz. Preimesberger testified:

"Well, Bob got out, and I says, 'Let's go to Genola', and he says, 'Well, I will give you the keys to my car; you can bring my car back'. And I says, 'Okay; and I wanted to go home, and I told Pankratz, 'Let's go to Genola', and he said, 'Well, I can take you home first', and I said, 'No, let's go to Genola first'; but then he asked me again where I lived, and I told him where I lived.

"Q. Then what happened?

"A. He took me home there, and I got out of the car and so did Laura. I walked towards our house and Laura walked up the sidewalk, and Pankratz drove up maybe about ten feet, and she got back in the car, and I went to bed."

It is not disputed that, when they arrived at the Preimesberger home, both Preimesberger and Laura got out of the car; that Laura started walking to her home at Genola; that defendant drove his car up near where she was walking and asked her if she wanted to ride along to Genola as he was going right through there anyway; and that she replied O. K. and entered the back seat of defendant's car. She was not seen alive again by anyone other than defendant. The next morning Leroy Brausen found the dead body of Laura in his bed with him in the condition which will be hereinafter described. He immediately notified a mortician, who came to the house. The coroner and sheriff were then called by the mortician.

Defendant was taken into custody by the sheriff about 10 a. m.

on July 24. Upon being questioned by the sheriff, defendant stated that after he had picked up Laura he started to drive toward Genola on highway No. 218; that when he came to the intersection of No. 218 and No. 27 he turned west on highway No. 27; that Laura then asked him where he was going; that he said that he was going to take the graveled road, whereupon she said that she was going to jump; and that she opened the back door and jumped out. He said that at the time he was going about 35 miles per hour. Defendant went with the sheriff to the place where he claims the deceased jumped. The sheriff testified that this spot was 478 feet west of the intersection. At that point the sheriff found one of the combs worn by the deceased. He testified that there was no evidence of grass being bent or the sod broken. The sheriff testified that he questioned defendant concerning the reasons why the deceased jumped. His testimony was as follows:

"Q. Did he tell you whether he had any conversation with her then?

"A. He said he was going home and he would take her home on the way, and she got back in the car. They went through Pierz on 218. They got to 27 and he turned to the right towards Little Falls. She asked Mr. Pankratz where he was going, she wanted to go home. Well, he said, 'I am going on 27 and I will turn off on the gravel road and take you that way', and he says—Mr. Pankratz told me shortly after that she jumped out of the car. And I said 'Well, you must have made some suggestive remarks or grabbed her or threatened her or something like that.'

\* \* \* \* \*

"Q. I understand this was the conversation he had with you while he was in your custody?

"A. That's right. And she jumped out on 27 towards Little Falls; and I said, 'Well, there must have been some reason for her to jump out. You must have grabbed her or you must have been suggestive or done something so she got scared'. I said, 'Did you make any more dirty remarks or anything and grab her?' Well, he says, 'I'm not a murderer; I didn't kill that girl'. I said, 'I

didn't ask you anything about that'. I said, 'Did you make any suggestions so she got scared and jumped out?' Well, he said, 'I must have said something, I don't know'."

Defendant's statements at the time are best shown by a written statement given to the sheriff, which reads as follows:

"My name is John Pankratz. I am 32 years old. I was born November 13, 1918. I am married and have three children. I live at Pierz, Route 2, four miles east, two miles south and ½ mile west of Buckman on the south side of the road.

"I first saw Laura Brausen at Bud's Place in Genola about 10:00 o'clock on Monday, July 23. She was with Bobby Brausen and Art Preimesberger. I was drinking whiskey and later on we all drank whiskey. About 11:00 o'clock we went to Little Falls to Bobby's sister who is Mrs. Bud Zyvoloski. We stayed there until after 12:00, then we took Bobby's girl friend home. I don't know her name. Then we went back to Pierz. Bobby was driving my car. I was sitting in front with Bobby and Art and Laura were in the back seat. At Pierz we let Bobby off and I drove the car. Then I took Art home. Art lives in the village of Pierz. When Art left Laura got out too and said she'd walk home to Genola. Then I said, 'You can ride with me, I'm going through there'. She said, 'O. K.' And got in the back seat of my car. I started south out of Pierz and turned right on No. 27. When I did that Laura asked where I was going and I said, 'I'm going to take the gravel road'. Laura said, 'I'm going to jump out', and she opened the door and jumped out on the right hand side. I was going about 35 miles per hour then. This was about 1:30 or 2:00 o'clock. I didn't know what to do when she jumped out. I drove on about a block, then I backed up. Laura was unconscious. I shook her and she didn't say anything, so I picked her up and put her in the car and took her to Bob's place. He was home alone and I couldn't wake him. So I carried the girl in his house and put her in bed with him. Then I left and went home. I didn't think of calling a doctor or officer. We all had been drinking pretty heavy.

"When I got to Bob's place I first walked upstairs and there wasn't anybody up there, so I walked downstairs and found Bob in bed. I think he was undressed; he was under the covers.

"This statement consisting of two handwritten pages was given by me to Sheriff Plettl and County Attorney Felix on July 24, 1951, voluntarily and no threats or promises were made to me."

The rear doors of defendant's car opened toward the back. The sheriff examined the door through which defendant claimed Laura had jumped and found that it was not sprung.

Edward Langer and his family live on a farm on the south side of highway No. 27 about a mile west of the intersection of that highway with highway No. 218. He also farms land on the north side of the highway west of and near the township road. On the land north of the highway he had an oat field of about 62 or 63 acres. To the east of his oat field he had a cornfield of about 37 acres. To the north of the Langer cornfield and adjoining the township road there was another oat field belonging to a Mr. Karst. Langer testified that during the night of July 23, or in the early morning of July 24, he heard a car stop. He said that it appeared to be pulling hard and then it stopped. He arose and looked but could see nothing. He stayed up about ten minutes and then went back to bed, and about half an hour later he heard a car start up and drive toward Pierz. He had some pullets near the road and thought that possibly someone was stealing them. Mrs. Langer testified that she also heard a car start up; that she got up and looked and saw the car drive away; and that she watched the car after it was on the highway going toward Pierz as far as she could. They heard no outcry or screams.

The next morning the Langers went up to the highway to investigate. They found a track running into the oat field and followed it. Mr. Langer's description of what he found was as follows:

"A. Well, I followed the track, and when I got to about—oh, I don't know—about so far in there, there was—right alongside of the car track, there was a spot about three or four feet by five or six

feet that was just about completely—the grain was down and all worked up.

"Q. And was there anything else there?

"A. I noticed a track from the west side on the left-hand side of the car that went around the car in the front—just one track through the grain."

Langer found a piece of thread at the spot. That evening he reported to the sheriff what he had found. The next morning the sheriff investigated the field. His testimony concerning what he found was as follows:

"A. Off of Highway 27 just beyond the Leo Langer home there was car tracks going into an oat field. I followed those tracks. They went in 83 feet. 74 feet in the oats had been trampled down for an area of about 6 by 8 feet; and in that oat field I found a man's—or a comb; I wouldn't say a man's; I found a comb.

"Q. What color comb was it?

"A. Green."

The sheriff showed the comb which he found to defendant, and he said that it looked like his. Thereupon, defendant was questioned further and then gave the sheriff an additional statement, which read as follows:

"When I gave the previous statement I forgot to mention that right after Laura jumped out of my car I drove on a little way, then came back and picked her up and put her in the front seat and drove on towards Little Falls for about one mile to a grain field. I drove into this field about 80 feet. Then I laid Laura in the oats. I thought she was dead. I stayed there just a few minutes, or a little longer. Then I picked her up and put her back in the front seat and drove back to the highway and headed east. When I reached Highway No. 218 I crossed it a little way and thought about putting her in the river. Then I decided to go back to Leroy Brausen's at Pierz and leave her there. I tried to wake Leroy up but I couldn't."

The ring worn by Laura on the fateful night was later found by her brother at the trampled-down spot in the oat field imbedded in the soil. The evidence is that the ring fit Laura's finger snugly.

The sheriff then made a further inspection of other fields near the oat field. Going north on the township road from highway No. 27, he found car tracks 1,310 feet north of the intersection and a spot in the Karst oat field which showed where the oats had been trampled down. In the Langer cornfield he found footprints running in a southerly direction. The shoes worn by the deceased, according to the sheriff, matched these footprints. His testimony was:

"Q. Did you compare the footprints to the shoes?

"A. I did.

"Q. And what did your comparison reveal?

"A. The prints were identical to the shoes, the same size, same cut."

He could find no footprints in the road. His testimony was that the soil in the road was hard, but the soil in the cornfield was soft as it had been cultivated.

Samples of the dirt from the Langer oat field, the Langer cornfield, the Karst oat field, and the place on the highway where defendant claims the deceased jumped, together with other samples which had nothing to do with the location involved, were taken by the sheriff to the bureau of criminal apprehension and there scientifically compared by a laboratory analyst with samples of dirt found on deceased's shoes about half an inch above the heel and soil vacuum-cleaned from clothing worn by deceased. The analyst testified that he found the soil on the shoes and in the clothing similar to samples taken from the two oat fields and the cornfield but dissimilar to that taken from the highway. He found no evidence of tar on the clothing. He also compared the thread found by Langer in the oat field with the jeans worn by the deceased and found that they had a similar origin. Defendant's clothes were not taken to the bureau. There is a conflict in the

testimony as to why they were not. The sheriff testified that when he asked defendant's wife for such clothing she said that she had already washed them. Defendant's wife testified that she asked the sheriff if he wanted the clothes and that he said it would not be necessary, after which she washed them and took them to her husband.

With respect to the clothes that defendant was wearing on the evening involved and the appearance thereof the next day, his wife testified:

"Q. Can you tell us generally what clothing he was wearing?

"A. He was wearing a white dress shirt, a gray pair of wash pants and brown shoes.

"Q. Did you see his clothing when he returned home the next day or that night, or sometime shortly thereafter?

"A. Yes, sir.

"Q. Can you tell the Court and Jury how this clothing looked, the appearance of it and so forth?

"A. Well, there was some dirt on the pants, not too much; and the shirt had a couple of pink-tinged spots. There might have been three."

Defendant's shoes were taken by the sheriff but were not introduced in evidence. The record does not disclose what became of them.

The other comb worn by the deceased was found in the back seat of defendant's car. There is conflict in the testimony as to how it was found. The sheriff testified that he found it. Defendant's wife testified that her daughters found it and that she turned it over to the sheriff.

The state contends that sometime during the night the deceased was disrobed. Defendant denies this. The mortician who was first called testified:

"Q. Will you describe the appearance of the body after the clothing was removed?

"A. Well, the body was extremely dirty. There was even dirt in the hair and it seemed to go way down to the soles of the feet,

sort of an earthy dirt. Well, we never had a corpse really as dirty as that was.

"Q. Now, when you say soles of the feet, are you referring to the bottom of the shoes or the bottom of the bare feet?

"A. Of the bare feet.

"Q. And that was under the stockings and shoes?

"A. Yes.

"Q. You found dirt there?

"A. Yes.

"Q. Was that the kind of dirt you find on a body that accumulates dirt naturally?

*   *   *   *   *

"The Witness: It's the same kind of dirt that you probably discovered on your own body if you worked in a garden, only you discover it above the shoes, kind of loose ground.

*   *   *   *   *

"Q. Was there any other part of the body that contained any dirt or soil or anything of that nature?

"A. Well, I said the whole body, even the hair, was accumulated with dirt so that when we washed it we had extreme difficulty to get it cleaned up.

"Q. Was there dirt on the legs of this body?

"A. Yes. All over, I said, even down on the feet, too."

The coroner who was called described the appearance of the body when he saw it as follows:

"The body was lying in bed. She was on her left side, fully clothed. Her clothing was soiled. Her face was soiled. Her arm was showing, and there were a few abrasions. I can't recall the exact locations of the abrasions without referring to notes. We did not disturb the body in any way at the time, because I called a photographer to take pictures so that we would have these pictures without disturbing the body."

The photographs taken are in evidence and confirm the description of the exterior view of the body as found. The coroner found

that the watch worn by the deceased had stopped at 1:30 a. m. He identified the clothing worn by deceased, which he stated was turned over to the sheriff. He ordered an autopsy performed by Dr. Thomas R. Simon, a pathologist in St. Cloud. On cross-examination the coroner testified that the brassiere worn by the deceased was torn and that there was a tear in the left pocket of her jeans.

The findings of Dr. Simon are best described by his own testimony:

"A. On examining the body externally I saw blood tinged frothy fluid coming from the mouth and the nose. There were no foreign bodies in the vagina, rectum, nose or mouth. There were stains consisting of dirt. These were located on the right side of the face, on both hands, on the left thigh, and on the bottoms of both feet. There was a blade of grass in the pubic hair. External injuries and signs of disease were abrasions. There was no external evidence of fracture. These abrasions were located on the right ear, the point of the left shoulder, the area over the upper part of the left scapula or shoulder blade, the left arm, left hand, right elbow, right wrist and the left buttocks. There was an area of blood accumulated beneath the scalp in the left parietal area. That's in approximately this area (indicating). There was no evidence of fracture in the skull. There was clotted blood beneath the dura, which is the tough outermost membrane covering the brain. This was located on both sides, mostly on the right. There were small amounts of blood in the subarachnoid space, which is under the middle membrane outside the brain. The source of this bleeding was not obvious. The brain showed small areas of hemorrhage in the superficial layers of the cortex in both parietal areas.

"Q. You are indicating a spot right above your ear on the side of your head?

"A. Approximately. The parietal area extends to midline and down to about this level, the area overlying the parietal bone and underlying it. Each lung weighed about 600 grams, it was estimated. Now, that's about twice normal, a little more than twice

normal weight. This increase in weight was due to congestion and edema. There was some frothy blood-tinged fluid in the bronchi and the trachea. This was of the same nature as the fluid coming from the nose and mouth.

"Q. Would you explain the term 'edema'?

"A. Edema is accumulation of body fluid—not blood, but tissue fluid. There was no obstruction in the trachea. There was no foreign body or other obstructions. There was no evidence of direct trauma to the neck.

"Q. Perhaps, Doctor, you might explain to the Jury what the trachea is.

"A. The trachea is the tube leading from the—it's the tube connecting the lungs essentially with the mouth—not directly; there is other structure in between but it is the tube through which the air passes, among other things, on its way to the lungs. There was no obstruction there. The pericardium, heart, stomach, intestines, liver, gall bladder, spleen and kidneys were all grossly normal. As to the pelvic organs, there was a vaginal pad and underwear and they were stained with blood and urine. I made microscopic examination of these by wetting the stains with salt water and smearing slides with the expressed fluid and examining them under a microscope, and on this examination I found no spermatozoa. There was no evidence of recent trauma to the vulva. The hymen showed carunculae myrtiformes. The hymeneal orifice admitted two fingers. There was a sheet submitted which had stains, and I made similar examination and again found no spermatozoa. And as a conclusion from the foregoing examination I found the cause of death was respiratory failure due to subdural hemorrhage and hemorrhages into the brain, the results of traumatic injury."

The doctor's testimony that he found dirt that looked as if deceased had had her feet in dirt was stricken as not responsive, but he was then asked:

"Q. Did you find dirt on any other parts of the body?

"A. Yes, sure. There was dirt on the right side of the face, both hands, the left thigh, in addition to the bottoms of the feet."

It was the opinion of Dr. Simon that deceased lived for some time after she sustained the injuries which led to her death. He was asked whether in his opinion the deceased was living or dead when placed in the bed. His answer was:

"From this finding I think it is impossible to draw any very definite conclusion, but it appears to me that that frothy fluid had been breathed out rather than just flowed out through the nose."

He further stated his opinion to be that a person sustaining the injuries found on deceased could die within 15 minutes or more, but death would not be instantaneous; that it would be an exceptional case in which death followed in 15 minutes; and that in most instances death does not follow in an acute subdural hemorrhage in less than an hour or more.

Defendant's assignments of error, as we see them, present three questions:

(1) Does the evidence sustain a finding that the crime of manslaughter in the second degree was committed by defendant?

(2) Was there such misconduct on the part of the prosecuting attorney as to require a new trial?

(3) Did the court err in refusing defendant's requested instructions?

■ The applicable rule is that, where the conviction rests upon circumstantial evidence, all the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. But, as we said in State v. Johnson, 173 Minn. 543, 545, 217 N. W. 683, 684:

"* * * By the term 'circumstances proved' is not meant every circumstance as to which there may be some testimony in the case, but only such circumstances as the jury finds proved by the

evidence. There may well be in any case testimony on behalf of the defendant as to inconsistent facts and circumstances, not conclusively proved, and which the jury may have a right to and do reject as not proved. Followed to its logical conclusion, the secondary rule stated reverts back to the reasonable doubt rule. For, if any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises."

The rule does not mean that the jury is to abdicate its function of fact finding to the extent that it may not determine what evidence is entitled to belief where the testimony of defendant is inconsistent with other circumstances proved.

"* * * In the light of the verdict of the jury, we must take the most favorable view of the state's testimony of which it is reasonably susceptible, and it must be assumed that the jury believed the state's testimony and disbelieved that which contradicted it." State v. Schabert, 222 Minn. 261, 268, 24 N. W. (2d) 846, 850.

In this case, the testimony of defendant was impeached to such an extent that the jury would be justified in concluding that he was not telling the truth. In his first statement to the sheriff he did not mention the fact that he had been in the Langer oat field during the evening. When confronted with the comb which he said looked like his, he admitted that he had been there; that he had taken the body of Laura and laid it on the ground; and that he later put it back in the car and then went to the home of Leroy Brausen. In many respects his testimony at the trial varied from his testimony at the coroner's inquest. For instance, at the trial he testified that Laura was dead when he picked her up at the place where he claims she jumped. At the inquest he stated that he thought she was then alive. At the trial he testified that Laura was dead when he took her to Leroy Brausen's home. At the coroner's inquest he stated that he did not know whether she was alive at that time or not. At the trial he stated that he turned off highway No. 218 because he presumed that Laura lived on the graveled road,

that is, on state aid road No. 8. At the coroner's inquest one of the jurors asked him why he took the graveled road instead of taking the straight road to Genola, and he answered: "It was a foolish way of doing. I was just going to go around there." He was then asked: "And your only answer to that was that you thought it was a foolish idea?" His answer was: "Yes, I just got a foolish idea of going that way around." At the trial he testified that he never intended to take any indecent liberties with Laura. At the inquest he was asked: "Did you at any time suggest to Miss Brausen that she have sexual intercourse with you?" He answered "No." He was then asked: "Are you positive?" and his answer was: "I don't think I said anything like that; I don't know." The next question was: "Could that have been the remarks that you made after you picked her up and before you turned off on 27?" and his answer was: "Maybe, I don't know." He was later asked the question: "Might I suggest that you maybe wanted to get her off to the side and take some liberties with her?" and his answer was: "I probably had such ideas. We were talking dirty there when we came home." There are other instances of inconsistencies in his testimony and his conduct which could be mentioned, but the above is sufficient to show that the jury could well have concluded that he was not truthful.

Assuming then, as we must, that the jury did not believe defendant, are the circumstances proved sufficient to satisfy the rule stated above? We believe that that question must be answered in the affirmative. The evidence would sustain findings that death was due to a respiratory failure brought about by a subdural hemorrhage and that the deceased was still alive at the time she was placed in the bed with Leroy Brausen. The jury was justified in accepting the opinion of Dr. Simon that it was more likely that the frothy fluid, which was apparent even when the body was found and which appears on the photographs in evidence, was breathed out than that it merely flowed out of the nose. The jury could also accept the opinion of the doctor that in all probability the deceased lived for some time after she sustained the injury which ultimately led to her death. It is true that the traumatic injury which caused the sub-

dural hemorrhage could have been inflicted in several ways. It could have resulted from falling or jumping 'out of the car. It could also have resulted from a blow on the head or a bump received in a scuffle. The absence of any evidence that deceased had struck or rolled on the side of the road where defendant claimed she jumped or fell out of the car; the absence of any tar on her clothing or body; the dissimilarity of the soil at the location and soil found on the shoes and in the clothing of the deceased; and the sheriff's testimony that the rear door of defendant's car was not sprung, coupled with the impeachment of defendant's testimony, amply justified the jury in finding that the deceased did not receive such injuries by falling or jumping out of the car, as defendant claims she did. On the other hand, there is evidence of a tussle of some kind in the fields described above. The jury could also find that the deceased was at least partly disrobed during the night. Defendant was the only person with her. If the jury did not believe that the deceased received her injuries by falling or jumping out of the car, it could find that the fatal injuries were inflicted by defendant. In the very nature of things, when a conviction rests on circumstantial evidence, there are no eyewitnesses. The evidence that the Langers heard no outcry is not such conclusive proof that there was no struggle in their oat field that the jury would be compelled to so find. The presence of the ring worn by deceased imbedded in the soil; the trampled-down condition of the oats; the thread that was found which was similar to the material of the jeans she wore; the tear in the pocket of her jeans; the torn brassiere; and the length of time that the car observed by the Langers remained in the oat field would justify a finding contrary to the story which defendant told. Coupled with this is defendant's failure to tell the sheriff that he had been in the Langer oat field until he was confronted with the comb found there, which he admits looked like his. Failure to explain the presence of the comb of deceased found by the sheriff at the place where defendant claims the deceased jumped is not so conclusive that it compels acceptance of defendant's claim of what took place. Nor is the fact that the watch of deceased had stopped

at 1:30 conclusive proof of the fact that she must have jumped shortly after they left the Preimesberger home. The record does not show whether the watch was ever on time, nor whether it ran down or was broken. Neither does it appear how long it would have taken to drive from the Preimesberger home to the fields where the state contends the first assault took place.

It is obvious from reading the record that during the whole evening defendant desired the company of a girl friend. His conduct in taking Preimesberger home instead of taking him to Laura's home first is evidence of his desire to be alone with the deceased. From that point on the evidence is circumstantial, but, if the jury refused to believe defendant's testimony, as it must have, the evidence sufficiently establishes the essential elements of the crime of which defendant has been convicted.

■ We have carefully examined the argument of the prosecuting attorney as well as that of defendant's attorney, both arguments appearing in the record in full. While the county attorney's argument was vigorous, so was that of defendant's attorney. There are statements in the argument of the county attorney which could well have been omitted. However, the case was well tried on both sides, and we believe that whatever was said by the county attorney was effectively answered by defendant's attorney. The jury was instructed by the court to disregard any statements or arguments of counsel about matters not in evidence or about what facts were established by the evidence which did not coincide with their recollection of the facts as they found them to be established by the evidence. It would serve no useful purpose to set forth the statements which defendant contends were prejudicial and improper. We do not believe that the jury was prejudicially affected by such statements to the extent that it can be said that defendant has been deprived of a fair trial.

■ Defendant assigns as error the court's refusal to give certain requested instructions. Defendant's requests Nos. 7, 8, and 2 to 6 deal principally with the law pertaining to circumstantial evidence.

With respect to the weight to be given to circumstantial evidence, the court instructed the jury as follows:

"* * * The law makes no distinction between circumstantial evidence and direct evidence as to the degree of proof required for conviction, but respects each for such convincing force as it may carry and accepts each as a reasonable method of proof. Either will support a verdict of guilty if it carries the convincing quality required by law as stated in my instructions. However, circumstantial evidence should be weighed carefully, and where circumstantial evidence is relied upon in a criminal prosecution, any fact or circumstance which is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, must be resolved most favorably to the defendant. Moreover, I instruct you that you are not permitted on circumstantial evidence alone to find the defendant guilty of any crime charged against him, unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime but are inconsistent with any reasonable theory of innocence."

The court's instruction correctly stated the law with respect to circumstantial evidence. It was not necessary to give the law in the exact language of the request so long as the applicable law was correctly stated by the court in its charge.

Defendant's request No. 9 reads as follows:

"The time and place of death of Laura Brausen must be proved by the State of Minnesota by evidence that satisfies you beyond a reasonable doubt."

The court instructed the jury:

"The State in its effort to prove that the defendant is guilty of the wrongful taking of the life of Laura Brausen has produced evidence which it claims tends to prove beyond a reasonable doubt four essential elements which are necessary to so prove before the Jury would be warranted in returning a verdict of guilty:

"1. That Laura Brausen, mentioned in the indictment, is in fact dead.

"2. That her death was caused by the act of some person.

"3. That the defendant, John Pankratz, is the person whose act caused the death of Laura Brausen.

"4. That there was no excuse for the commission of such act by defendant John Pankratz."

The court later again instructed the jury that before they could find defendant guilty they must be satisfied beyond a reasonable doubt that the state had proved the four elements stated above. We believe that the court's instructions sufficiently covered the requisites of proof to establish the guilt of defendant.

Defendant's request No. 10 reads as follows:

"If the various items of circumstantial evidence or any of them offered by the State of Minnesota happened after Laura Brausen was dead such acts would not constitute any evidence in this case to support any criminal charge against this defendant."

The court in its instructions stated that it was necessary for the state to prove beyond a reasonable doubt that the acts of defendant brought about the death of Laura Brausen. We cannot see how this requested instruction was necessary or would have added anything to the court's instruction.

Defendant also assigns as error the court's definition of "trespass or other invasion of private right" which term is used in the statute defining the crime of manslaughter in the second degree. The court stated the definition as follows:

"The term 'trespass or other invasion of a private right, not amounting to a crime' in the foregoing definition means some physical act against the person killed in the nature of a transgression of a duty owed to others, involving some violence, however slight, such violence being no more than the breaking of a blade of grass. A private right means some power or privilege to which one is entitled upon principles of morality, religion, law or the like. It means a natural right peculiar to an individual, one's own right."

Defendant argues that, assuming that the jury found that the deceased jumped or fell from the automobile and sustained the injuries

which led to her death from such jump or fall, there would be no evidence which would constitute a trespass or invasion of a private right justifying the submission of the crime of manslaughter in the second degree. We do not believe that such assumption would be justified for the reason that the jury's verdict is, without doubt, based on a rejection of defendant's testimony as to how the injuries were sustained. We can find no fault with the definition.

■ At the close of the case defendant requested that the court submit to the jury only the question of whether defendant was guilty of murder in the second degree as charged in the indictment, contending that the evidence did not establish any trespass and therefore a verdict of manslaughter in the second degree would not be justified by the evidence. The court refused to do so. Defendant now assigns as error the court's definition of trespass.

With respect to the submission of a lesser degree of the crime of which defendant is indicted, we believe that the correct rule is stated in State v. Stevens, 184 Minn. 286, 291, 238 N. W. 673, 675. In that case defendant was indicted for manslaughter in the first degree. Over the objection and exception of defendant, the court submitted manslaughter in the second degree, and the jury found defendant guilty of such lesser degree of the crime charged. On appeal, defendant assigned as error the court's submission, over his objection, of the lesser degree. We said:

"Where it is clear that a particular crime has been committed and there is no evidence justifying a verdict of any lesser degree than the one charged in the indictment, it is the duty of the court to instruct the jury that it is their duty to convict of the particular crime or acquit. State v. Nelson, 91 Minn. 143, 97 N. W. 652; State v. Morris, 149 Minn. 41, 182 N. W. 721. Where there is no evidence to justify a verdict in a lesser degree, it should not be submitted to the jury. State v. Potoniec, 117 Minn. 80, 134 N. W. 305. Where however the evidence may be construed as covering a lesser degree of a crime charged, it is the duty of the court to submit that degree. State v. Tuomi, 167 Minn. 74, 208 N. W. 528."

Where the evidence will justify a verdict of a lesser degree of the crime than is charged in the indictment, defendant may not demand as a matter of right that the court submit only the degree of the crime charged in the indictment. If, however, his request to do so is granted by the court, he cannot thereafter complain of the court's action. In State v. Morris, 149 Minn. 41, 45, 182 N. W. 721, 723, we said:

"* * * If the evidence is such that a jury may convict of a lesser degree of the offense charged, the accused is entitled to an instruction submitting the lesser degree. * * * If, on the other hand, the accused desires to relinquish his chance of escaping with a conviction of a lesser offense in the hope that the jury will refuse to convict him of a greater, he should request the court to instruct that the only permissible verdicts are guilty as charged or not guilty, and no such request was made here."

See, also, State v. Gavle, 234 Minn. 186, 48 N. W. (2d) 44.

The above statement in the Morris case should not be construed to mean that the court is compelled to submit, at the request of defendant, only the degree of the crime charged in the indictment where the evidence will justify a verdict of guilt on a lesser degree of that crime.

Manslaughter in the second degree, as far as material here, is defined by M. S. A. 619.18 as follows:

"* * * homicide is manslaughter in the second degree when committed without a design to effect death:

"(1) By a person committing or attempting to commit a trespass or other invasion of a private right, either of the person killed or of another, not amounting to a crime;"

The court's definition of trespass, as set forth above, was adequate.

There was evidence from which the jury could find defendant guilty of manslaughter in the second degree as defined by our statute; hence, there was no error in submitting that degree of the crime to the jury.

Affirmed.

Mr. Justice Roger L. Dell, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

[1]Reported in 57 N. W. (2d) 681.