STATE v. DWAINE B. WEBER.

137 N. W. (2d) 527.

September 10, 1965—No. 39,348.

244

*Cochrane, Thomson & Bresnahan,* for appellant.

*Robert W. Mattson,* Attorney General, *Linus J. Hammond,* Assistant Attorney General, and *Roger J. Nierengarten,* County Attorney, for respondent.

NELSON, JUSTICE.

An information was filed against Dwaine B. Weber, defendant herein, charging him with assault in the second degree. After trial before a jury, a verdict of guilty was returned and sentence was imposed. Defendant thereafter appealed to this court from an order denying his motion for a new trial or for a judgment of acquittal, and from the judgment of conviction.

The following facts are pertinent to a consideration of the issues raised on appeal. Defendant married James (Jimmy) Newman's mother in May 1963. Jimmy, then 8 years of age, had been living on defendant's farm since February of that year. The assault on Jimmy allegedly occurred on August 6, 1963. A neighbor, Clifford Knebel, owned a farm contiguous to defendant's. On August 6, 1963, Clifford Knebel had spent the day on his farm before leaving for Paynesville, Minnesota, about 8:15 p. m. His testimony was that he saw Jimmy Newman between 6:30 and 7 p. m. walking down his road and into his barn where his daughter and son were milking; that about 15 or 20 minutes later he saw the three come out of the barn. They walked over to him and Jimmy Newman told him that he would like to stay at his place. Mr. Knebel said to Jimmy that his mother must be looking for him and asked if he could take him home. Jimmy said that Mr. Knebel's place was nicer than his and that he wanted to stay. The Knebels then took Jimmy into their home and gave him a roll and a glass of milk. Later, between 8 and 8:15 p. m., Mr. Knebel and his family, except for his son Jay, left for Paynesville. Jay Knebel drove Jimmy to the fence line which separates the Knebel farm from the defendant's farm and which was approximately 300 yards from Jimmy's

home. After Jay left the fence line and started back home, Jimmy turned around and shortly thereafter went back into the Knebel yard. Jay Knebel again took Jimmy into their home and gave him some more food, and between 8:30 and 9 p. m. Jay again drove Jimmy back to the fence line between the two farms. Defendant at this time saw the car and came down to get Jimmy. Defendant thanked Jay and Jay went home.

It appears from the record that Mr. and Mrs. Knebel had not known Jimmy Newman before the evening of August 6, 1963. According to the testimony of the Knebels, Jimmy acted and walked normally while on their farm.

Dr. Ernest J. Aulick, while at the Community Hospital at Paynesville, Minnesota, at about 9 p. m. on August 6, 1963, saw defendant come into the hospital with his stepchild in his arms and heard him say, "Doc, I've got a bad one." Dr. Aulick ordered the child taken to the emergency room. Jimmy was bleeding from a cut on the right temple, was unconscious, and his respiration was slow and somewhat deep. Further examination disclosed a cerebral contusion or bruising of the brain, otherwise known as a concussion; he had minor bruising about the chest and upper part of the arm and a little redness on the buttocks. Jimmy remained unconscious for about one week. On the morning following his entry into the hospital, Jimmy's buttocks had turned a dark purple and increasing discoloration appeared around his chest, arms, and to a lesser degree on one of his thighs. There was also discoloration between his legs, and his testicles were discolored and swollen.

During the trial defendant tendered the court a "judicial admission" wherein he admitted that Jimmy Newman had been assaulted and had suffered "grievous bodily harm" but denied that he had inflicted it. Defendant testified in his own behalf at the trial, and at the completion of the testimony moved for a directed verdict of acquittal, which was denied. Defendant also moved to strike the testimony of Dr. Aulick and to strike all testimony bearing on the injuries inflicted on Jimmy Newman, which motions were denied.

■ Defendant takes exception to the trial court's denial of the following requested instructions:

"I instruct you that as a matter of law that the statements made by de-

fendant while he was in custody at Police Headquarters do not include or amount to an acknowledgment of guilt on his part of this alleged crime and are not, as a matter of law, considered a confession. Such statements made by defendant while in custody are in evidence here as part of the State's proof of circumstantial evidence and are to be considered by you only as circumstantial evidence in connection with all of the other evidence in this case."

"It is the law of this state, and I so instruct you, that statements of an accused person made by him while in custody of the authorities, are not sufficient, in a criminal prosecution, to warrant a conviction, unless such statements are corroborated by evidence independent of mere proof of the commission of a crime by someone. In other words, so that you may more clearly understand this important rule, as it applies to this case, any statements made by defendant while he was in custody are not sufficient to warrant a conviction in this case, unless such statements are corroborated by other independent evidence tending to prove that he committed the assault. In this connection I further instruct you that if there is not such other evidence tending to prove that defendant assaulted James Newman, his statements allegedly made while in custody are not sufficient to warrant conviction and you must therefore return a verdict of not guilty."

The foregoing instructions would be necessary if defendant had not stipulated to the establishment of the corpus delicti. The corpus delicti is the proof that a crime was committed. See, 1 Underhill, Criminal Evidence (5 ed.) § 35; 23 C. J. S., Criminal Law, § 916(1). However, when defendant did so stipulate, the instructions he requested became moot since, once a corpus delicti is established, defendant can be convicted on his own admission. See, 2 Wharton, Criminal Evidence (12 ed.) § 394. So far as the other requested instructions are concerned, we think they were adequately covered by the general instructions to the jury as given by the court.

Defendant on appeal raises the question whether there was sufficient evidence produced to connect him with the crime charged. No eyewitnesses testified to any phase of the crime. The proof offered by the state consisted of the alleged admissions by defendant to the sheriff's deputies and statements made by defendant to Dr. Aulick, which were in no sense

more incriminating than the defendant's own testimony at the trial, several statements being practically identical. Defendant denied any severe treatment toward the boy. Jimmy Newman did not testify.

Mr. Lawrence D. Kritzeck, a deputy sheriff of Stearns County, testified that he was called to the Community Hospital at Paynesville at about 11 a. m. on August 7, 1963; that while he was there he saw Jimmy, spoke to Dr. Aulick, and then went directly to defendant's farm where he talked to defendant. In response to a question by Deputy Kritzeck as to what had happened to Jimmy, the defendant said, "Well, I'm in serious trouble." The deputy thereafter suggested to defendant that he accompany him to the sheriff's office, and defendant acquiesced. While there, defendant was asked to give a statement but he declined, saying to the deputy that he would have to talk to the sheriff first. No part of defendant's statement has been recorded in writing or in any other manner. All testimony by the sheriff's deputies was given from memory. Deputy Kritzeck testified that while he and the defendant were alone the following ensued:

"I asked him what happened out there, and he stated to me that Jimmy had been running away and that he had been looking for him, and when he came back he had given him a licking; and he said that he had grabbed him by the chin. I asked him about some markings that were on the boy's chin, and I asked him how they got there; and he says, 'I grabbed him by the chin.' And I asked him why, and he said, 'Because the boy was looking down and he wouldn't look up to me.' And I asked him if had given him a licking, and he said yes, and I asked him how hard, and he said well, hard enough so that his hand had stung."

Deputy Kritzeck also testified that defendant said that he was—

"* * * putting him into the truck, because he was tired of going after him, and he pushed him into the truck, and Jimmy had hit his head on the steering knob, and he went limp, and he says he got scared and he grabbed him and he took off for the hospital with him right away."

A second deputy sheriff, Frederick C. Pelzer, also testified at the trial. He stated that he had been in the room in which the defendant had been questioned for about 10 minutes and that defendant said that he struck

the child until his hand stung and that he was angry and threw Jimmy into the car.

The foregoing testimony is, in essence, the state's case against the defendant.

The defendant, on taking the stand on his own behalf, testified that at about 9 o'clock on the evening of August 6, 1963, Jimmy Newman was brought home by Jay Knebel and that he thereafter told Jimmy to go sit down. Jimmy was then asked where he had been. Jimmy sat with his head down. Defendant said he told him to raise it, and when he lifted Jimmy's chin Jimmy ran to the orchard and then into the blacksmith shop. Defendant says that he chased him, caught him, and carried him to the car; that he set Jimmy down while he opened the car door and then told Jimmy to get in but Jimmy balked and turned his head to the left. Defendant stated that he then pushed him and that the side of Jimmy's head hit the steering wheel knob and, when he noted that Jimmy was cut on the side of the head, he immediately rushed him to the hospital. Defendant denied applying repeated blows to the body of Jimmy Newman at any time between the hours of 6 and 10 p. m. on August 6, 1963. He also testified that in pushing Jimmy into the car he merely tapped him on the buttocks to give him a lift. He also testified that the wife of his hired man, Mrs. Oscar Schmitt, told him that she witnessed the entire occurrence from the front door in the house, but she was not called and did not appear as a witness.

The only other testimony which bears on the issues is that of Dr. Aulick, which was to the effect that the bruises on the buttocks could have been caused by application of force as early as 7 p. m. on the evening of August 6, 1963; that there was no laceration on Jimmy Newman's head other than the temple cut. Dr. Aulick said that the laceration of the temple could have been caused by the child's head coming in contact with the steering wheel knob.

■ Among other points, defendant argues that Minn. St. 1961, § 619.40, gave a parent the right to use reasonable and moderate force to correct his child. That statute reads in part as follows:

"The use, attempt, or offer to use force or violence upon or toward the person of another shall not be unlawful in the following cases:

\*    \*    \*    \*    \*

"(4) When used in a reasonable and moderate manner by a parent or his authorized agent, a guardian, master, or teacher, in the exercise of lawful authority, to restrain or correct his child, ward, apprentice, or scholar."

Defendant argues that Jimmy had been received into the family and treated as a member thereof by defendant as his stepfather and therefore that defendant must be regarded in the law as the natural parent so that defendant's force, if any, used upon the child, would be lawful when used in a reasonable and moderate manner. Defendant then argues that to place this issue before the jury as the court did in its instruction was error. The court instructed the jury on that issue as follows:

"Whether or not the relationship of parent and child existed between defendant and James Newman, is a fact for you jurors to determine from the evidence. If you find that defendant received James Newman into the family, and treated the child as a member of the family, then defendant would be considered in law a parent, and his use of force or violence toward the child would be lawful when used in a reasonable and moderate manner, in the exercise of lawful authority [to] restrain [or] correct the child. Force or violence used by a parent in a reasonable and moderate manner, and in the exercise of lawful authority to restrain or correct the child, would not be an assault in any degree."

There was no evidence introduced relative to defendant's treatment of the child prior to the injury, or whether defendant supported the child or treated him as a member of the family. The only testimony on that issue is that Jimmy Newman had been living with defendant since February 1963 and that defendant's marriage to Jimmy's mother occurred in May 1963. Gorman v. State, 42 Tex. 221, cited by defendant, therefore is not in point. Under these circumstances, we think it clear that the trial judge could not have determined as a matter of law that a parent-child relationship existed and that the question was properly and fairly submitted to the jury.

■ Defendant contends that the trial court erred in permitting the state to introduce the evidence bearing on the injuries. This contention is based upon what defendant terms a "judicial admission" made in the

presence of the jury at the commencement of the trial in the following words:

"That the defendant Dwaine Weber in open court judicially admits that James Newman was assaulted on or about the 6th day of August, 1963, as alleged in that certain Information filed in this court on September 26, 1963, and that the said assault as alleged in the Information comes within the purview of Minnesota Statutes 619.38, Subdivision 3, constituting the crime of Assault in the Second Degree; and the defendant further judicially admits that the said assault was of a degree that would support the charge of Assault in the Second Degree, but does not admit in a Bill of Particulars as filed by the County Attorney, and pursuant to order of this court, does not admit Particular Number 2, but does admit that the said James Newman suffered grievous bodily harm and wounds. Further, the defendant does not admit and specifically denies any infliction of grievous bodily harm on the person of James Newman by the defendant Dwaine B. Weber, and denies his guilt and complicity in the crime as alleged."

It is defendant's contention that under the circumstances nothing further relative to the injuries sustained by the child or the severity of those injuries was admissible. Defendant primarily objects to the testimony given by Dr. Aulick describing the condition of the child at various stages. He contends that evidence relative to the severity had no probative value and that it only served to inflame the passions of the jury. It must be conceded that evidence of brutality which appeared to have been inflicted upon Jimmy Newman did not and could not help the defendant. But it must also be conceded that it did give the jury a better perspective of the kind of abuse it took to inflict the injuries. The discussion in 9 Wigmore, Evidence (3 ed.) § 2591, is applicable to this situation and we think furnishes a correct approach:

"A fact that is judicially admitted *needs* no evidence from the party benefiting by the admission.

\* \* \* \* \*

"Nevertheless, a colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate *moral force of his*

*evidence;* furthermore, a judicial admission may be cleverly made with grudging limitations or evasions or insinuations (especially in criminal cases), so as to be technically but not practically a waiver of proof. Hence, there should be no absolute rule on the subject; and the trial Court's discretion should determine whether a particular admission is so plenary as to render the first party's evidence wholly needless under the circumstances."

This court held in State v. Billington, 241 Minn. 418, 63 N. W. (2d) 387, that it was not prejudicial error to admit in evidence a letter written by the defendant to the attorney general which corroborated the admission of the defendant made upon the trial that he shot the defendant. We determined in that case that the prosecution was not precluded from introducing evidence to establish facts which are admitted by the accused, provided the evidence is otherwise admissible and not unduly prejudicial. See, also, People v. MacPherson, 323 Mich. 438, 35 N. W. (2d) 376; People v. Neaton, 294 Mich. 134, 292 N. W. 589.

As we see it, the concession made by the defendant in his judicial admission did not go to all the matters referred to by the witnesses who testified. The prosecutor had the right to fairly prove by competent testimony the facts material to the state's case. We do not think that counsel for the defendant could preclude the exercise of such right by undertaking to make a qualified admission, coupled with a denial of guilt, and not going to all the matters material to the state's case. We do not think the court erred on this point.

■ As to defendant's contention that it was error to overcome his demurrer to the information, the record is clear that the bill of particulars called for was furnished and that defendant was adequately and fully apprised of the charge against him. Under the circumstances no further consideration of that point is necessary.

■ It has been held that a count is not duplicitous because it charges several related actions all of which constitute a single offense. Rowan v. United States (5 Cir.) 281 F. 137; State v. Gopher Tire & Rubber Co. 146 Minn. 52, 177 N. W. 937. Furthermore, additional allegations in an information which merely tend to show the commission of distinct offenses but are not sufficient in themselves to constitute a

charge thereof will not invalidate the information, the generally accepted rule being that they may be rejected as surplusage. Smith v. United States (8 Cir.) 17 F. (2d) 723; Bowdry v. United States (8 Cir.) 26 F. (2d) 791.

■ The state contends that the admissions made by defendant in the presence of Dr. Aulick and the deputy sheriffs were made prior to any arrest and during the investigative period. So far as the record shows, any admissions made to the doctor and the deputy sheriffs were made shortly after the injured boy was brought to the hospital and none later than the next afternoon.

In the case of In re Groban, 352 U. S. 330, 333, 77 S. Ct. 510, 513, 1 L. ed. (2d) 376, 381, the court stated:

"* * * When such charges are made [against a person] in a criminal proceeding, he then may demand the presence of his counsel for his defense. Until then his protection is the privilege against self-incrimination.

\* \* \* \* \*

"* * * The mere fact that suspicion may be entertained of such a witness [unrepresented by counsel] * * * does not bar the taking of testimony in a private investigatory proceeding.

\* \* \* \* \*

"* * * the presumption of fair and orderly conduct by state officials without coercion or distortion exists until challenged by facts to the contrary."

It was said in Anonymous Nos. 6 and 7 v. Baker, 360 U. S. 287, 79 S. Ct. 1157, 3 L. ed. (2d) 1234, that although defendant in a state criminal proceeding has an unqualified right to be represented at trial by retained counsel, such right to counsel has not been extended to the investigation stage of such proceeding.

We have examined Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. (2d) 977, and do not find that case changing the law expressed in the two aforementioned cases. The lower Federal courts have so expressed themselves. Long v. United States, 119 App. D. C.

209, 338 F. (2d) 549; Latham v. Crouse (10 Cir.) 338 F. (2d) 658; Proctor v. United States, 119 App. D. C. 193, 338 F. (2d) 533.

The Supreme Court of Ohio in State v. McLeod, 1 Ohio St. (2d) 60, 203 N. E. (2d) 349, considered oral admissions and confessions in the light of the Escobedo case and other cases and came to the conclusion that a voluntary oral confession made by an indicted defendant before he procured or was assigned counsel and before he was arraigned was admissible in evidence and did not amount to denial of guarantee of right to assistance of counsel.

Since the record in the instant case shows conclusively that the statements made by the defendant to the doctor and to the deputy sheriffs were voluntary and that no force, persuasion, pressure, or undue influence was used to exact them from him, granting a hearing on such "admissions" was not required and therefore the ruling of the court did not work to the prejudice of the defendant.

■ It is the contention of the state that the requested instructions were either properly denied or were included by the trial court in its general charge and in its own language. A reading of the court's instructions indicates that the court clearly instructed the jury on "circumstantial evidence" and the weight attached to such evidence. See, State v. Kaster, 211 Minn. 119, 300 N. W. 897; State v. Bailey, 235 Minn. 204, 50 N. W. (2d) 272; State v. Waltz, 237 Minn. 409, 54 N. W. (2d) 791. The evidence was both direct and circumstantial in the case at bar and the court so charged the jury. The court was not required to give the instructions in the exact language requested so long as the charge encompassed the principles governing circumstantial evidence as set forth by defendant. See, State v. Pankratz, 238 Minn. 517, 57 N. W. (2d) 635; State v. Brady, 244 Minn. 455, 70 N. W. (2d) 449.

The "admissions" of the defendant constituted direct and not circumstantial evidence. An "admission" is, after all, a statement, direct or implied, of facts tending to establish guilt. It does not necessarily constitute an acknowledgment of guilt but of facts and circumstances which, if taken in connection with proof of other facts, may permit an inference of guilt. Admissions are substantive evidence. 2 Wharton, Criminal

Evidence (12 ed.) § 397; Gulotta v. United States (8 Cir.) 113 F. (2d) 683; State v. Pankratz, *supra.*

In State v. Bowers, 178 Minn. 589, 228 N. W. 164, this court was required to consider whether the evidence was sufficient to justify the jury in finding beyond a reasonable doubt that the injury inflicted constituted grievous bodily harm. This court made the following statement (178 Minn. 591, 228 N. W. 165):

"* * * The word 'grievous' has been defined as meaning: causing grief or sorrow; painful; afflictive; hard to bear; offensive; harmful. As used in this penal statute, the words 'grievous bodily harm' mean an injury of a graver and more serious character than an ordinary battery or assault in the third degree. * * * What is grievous bodily harm is ordinarily a jury question. State v. Gaularpp, 144 Minn. 86, 174 N. W. 445."

The court in the instant case instructed the jury as follows:

"Grievous bodily harm means an injury of a grave and serious character. Grievous means painful, and offensive, and harmful. Willfully means designedly, and intentionally, and with an evil intent or bad purpose. Wrongfully means contrary to law, and without justification or excuse."

This instruction by the trial court appears to substantially comply with the law as stated in the Bowers case. No objection was taken to it and no request was apparently made by the defendant for a contrary instruction. The trial court also instructed the jury that it could find defendant guilty of assault in the third degree (that is, simple assault) if the evidence warranted.

It is well settled that in construing a charge it must be reviewed in its entirety and read as a whole. As we see it, the crime charged in the information filed in the instant case was explained, and proper instructions on the presumption of innocence and proof of guilt beyond a reasonable doubt were given to the jury. The distinction between circumstantial and direct evidence was pointed out, and the charge on circumstantial evidence was in agreement with the applicable law. Considering the charge as a whole it appears to us that the applicable law was fairly stated, that there were no inadvertent statements misleading to

the jury, and that no prejudice resulted to the defendant from the charge as given. Moreover, the defense indicated by taking no objection to it that it was substantially correct.

Evidence examined and held sufficient to sustain the verdict of the jury finding defendant guilty of the crime of assault in the second degree.

Affirmed.