**STATE of Minnesota, Respondent,**

v.

**Tou L. YANG, Appellant.**

**No. C7–00–713.**

Court of Appeals of Minnesota.

May 8, 2001.

Review denied July 24, 2001.

Mike Hatch, Attorney General, St. Paul; and Amy Klobuchar, Hennepin County Attorney, Linda M. Freyer, Assistant Hennepin County Attorney, Minneapolis, (for respondent).

John M. Stuart, State Public Defender, Ann McCaughan, Assistant State Public Defender, Minneapolis, (for appellant).

Considered and decided by PETERSON, Presiding Judge, SHUMAKER, Judge, and PORITSKY, Judge.

## OPINION

PORITSKY,* Judge

Appellant challenges his conviction of second-degree murder, attempted second-degree murder, and second-degree assault. First, appellant argues that the evidence was insufficient to support his conviction because the state's witnesses' descriptions of appellant were inconsistent with one another. Second, appellant argues that the district court abused its discretion in making several evidentiary rulings. Third, appellant argues that he should be granted a new trial because the prosecuting attorney committed misconduct by commenting on the credibility of the state's witnesses, misstating the evidence, inflaming the jury's passions, and denigrating appellant's witnesses. Fourth, appellant argues that the district court erred by (1) refusing to reopen the case after the jury had begun its deliberations so that appellant could present evidence that one of the state's witnesses had recanted his testimony and (2) denying his motion for a new trial based on this purported recantation. Because we find that none of appellant's claims warrant reversal, we affirm.

## FACTS

In the evening of July 9, 1999, Miguel McElroy had an altercation with appellant Tou Yang and another male near Wafana's Food Market in Minneapolis. Curtis Campbell, Miguel's father, saw the altercation as he was driving by so he stopped to check on his son. Miguel informed his father that Dominic McElroy, Miguel's older brother, had taken $60 from appellant to buy marijuana, but Dominic had not returned with the money or the marijuana. Campbell and Miguel began walking toward the entrance of Wafana's, and the other males followed. Appellant and the other male pulled out guns and fired at Campbell and Miguel. Miguel died at the scene as a result of the gunshot wounds, and Campbell was shot in the left buttock, but survived.

Appellant was charged with one count of second-degree murder, one count of attempted second-degree murder, and one count of second-degree assault. Following a jury trial, appellant was convicted on all counts. The district court sentenced appellant to 406 months for the second-degree murder conviction and 213 months for the attempted second-degree murder conviction, to be run concurrently. Appellant was not sentenced for the second-degree assault because it was a lesser-included offense. Appellant appeals from his conviction.

## ISSUES

I. Was the evidence sufficient to support appellant's conviction even though the state's witnesses' descriptions of appellant were not entirely consistent with each other?

II. In its evidentiary rulings, did the district court err by (1) denying appellant's motion to suppress the photographic identification display; (2) admitting older photos of appellant wearing various head gear; (3) denying appellant's request for an interpreter for one of his witnesses; and (4)

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

allowing the state to introduce a taped jailhouse telephone conversation between appellant and his wife?

III. Did the prosecuting attorney inappropriately comment on the credibility of the state's witnesses, misstate the evidence, inflame the jury's passions, or denigrate appellant's witnesses, and if so, did the prosecutorial misconduct warrant a new trial?

IV. Did the district court err by refusing to reopen the case after the jury had begun its deliberations so that appellant could present evidence that one of the state's witnesses had recanted his testimony and by denying appellant's motion for a new trial based on this recanted testimony?

## ANALYSIS

### I. Sufficiency of the Evidence

■■ In considering a claim of insufficient evidence, this court's review is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jury to reach the verdict it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). The reviewing court must assume "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). The reviewing court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988).

Appellant argues that the evidence was insufficient to support his conviction because the state's witnesses' descriptions of the shooter were inconsistent with one another.

■■ Identification is a question of fact, which the jury determines. *State v. Otten*, 292 Minn. 493, 494, 195 N.W.2d 590, 591 (1972). Resolution of inconsistencies among eyewitnesses' testimony is the jury's exclusive function "because it has the opportunity to observe the demeanor of witnesses and weigh their credibility." *State v. Lloyd*, 345 N.W.2d 240, 245 (Minn. 1984) (citation omitted).

Curtis Campbell, and witnesses Ronald Haynes and Toriano Simmons all positively identified appellant—both from the photographic display and in court—as the shooter. Witness Terrance Grady likewise positively identified appellant as being on the scene shortly before the shooting occurred. Although Dominic McElroy was not present at the shooting, his testimony about the abortive marijuana deal not only supplies appellant's motive for the offense, it ties appellant closely to the crime: McElroy testified that earlier in the day he took $60 from appellant but never delivered any marijuana. Campbell testified that just before the shooting, appellant demanded his money back, and told Miguel that his brother (Dominic) was dead.

We note that all four witnesses testified that they had the opportunity to observe appellant before he took out his gun and started shooting. Dominic McElroy testified that he had seen and talked to appellant on prior occasions and on the date of the shooting, and had spent time with appellant while they unsuccessfully shopped for marijuana. Campbell testified that he talked to appellant face-to-face for several minutes before appellant took out his gun. Simmons testified that he likewise observed appellant before the shooting.

■■ In determining the reliability of eyewitness identification, one of the factors

to be considered is whether the witness was under any stress at the time he or she observed the offender. *State v. Mesich,* 396 N.W.2d 46, 50 (Minn.App.1986) (citing and quoting *State v. Burch,* 284 Minn. 300, 315–16, 170 N.W.2d 543, 553–54 (1969), *review denied* (Minn. Jan. 2, 1987)). Thus, a witness who observes the offender before the offense—particularly an offense involving a gun—would be under reduced stress and would gain an additional measure of reliability. In fact, because McElroy testified that he had been with appellant earlier on the day of the shooting and had talked to appellant on prior occasions, his identification of appellant was based on recognition, which has a high level of reliability.

Although the state's witnesses who saw the shooter testified differently regarding the shooter's clothing, each testified that the shooter was a short, stocky male of Asian descent. Of the witnesses who were at the scene but did not see the shooting, all but one testified that they saw a short, stocky male of Asian descent at the scene, although their testimony regarding the man's clothing differed. Only two of the state's witnesses who were at the scene could not identify appellant from a photographic display, but neither witness saw the shooting. The fact that these two witnesses were unable to identify appellant does not mean he is innocent. *See State v. Hicks,* 380 N.W.2d 869, 873 (Minn.App. 1986) (concluding eyewitness who was unable to identify defendant only indicates uncertainty of particular witness and does not mean defendant was innocent).

■ The record demonstrates that the state's witnesses (1) had the opportunity to view appellant, (2) had some degree of attention while viewing appellant, both before and during the offense, (3) described appellant as a short, stocky male of Asian descent, (4) with two exceptions, identified appellant in a photographic display with certainty, and (5) viewed the photographic display between three to sixteen days after the incident. Any discrepancy regarding the description of appellant's clothing is minor. *See State v. Saunders,* 293 Minn. 372, 372–73, 196 N.W.2d 286, 286–87 (1972) (holding discrepancies in witnesses' testimony that appellant's facial hair may have been stubble, mustache, goatee, or full beard did not warrant reversal). Viewing this evidence in the light most favorable to the jury's verdict, there was sufficient evidence for the jury to conclude that appellant was guilty.

## II. Evidentiary Rulings

■ A reviewing court will largely defer to the district court's evidentiary rulings, which will not be overturned absent a clear abuse of discretion. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989).

### A. Pretrial Identification Procedure

Appellant argues that the photographic identification display was unnecessarily suggestive and that the district court erred by denying his motion to suppress it. Appellant asserts that the display should have been suppressed because he was the only Hmong in the lineup and because he was pictured in jail clothing. Appellant contends that these factors give rise to a very substantial likelihood of irreparable misidentification, therefore he asserts his conviction should be reversed.

■ A conviction based on eyewitness identification "will be reversed only if the photographic 'identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Seelye v. State,* 429 N.W.2d 669, 672 (Minn.App.1988) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). Minnesota courts review chal-

lenges to pretrial identification procedures under a two-part test. *State v. Ostrem,* 535 N.W.2d 916, 921 (Minn.1995). A reviewing court first determines "whether the procedure was unnecessarily suggestive," which "turns on whether the defendant was unfairly singled out for identification." *Id.* (citations omitted). Under the second part of the test, even if the identification procedure was suggestive, the identification evidence may nonetheless be admissible if the reviewing court determines that "the totality of the circumstances establishes that the evidence was reliable," meaning "the witness' identification has adequate independent origin." *Id.* (citations omitted).

A photographic display need not be comprised of "exact clones of the accused." *State v. Roan,* 532 N.W.2d 563, 572 (Minn. 1995) (quotation omitted). "It is sufficient if all the people in the display bear a reasonable physical similarity to the accused." *Seelye,* 429 N.W.2d at 672–73 (citation omitted).

■ Appellant's first argument is that the display was unnecessarily suggestive because he was the only Hmong in the display. This argument lacks merit. Three of the witnesses to the incident (Campbell, Haynes, and Grady) told the police that the shooter was a short, stocky male of Asian descent. McElroy, whose testimony tied appellant to the shooting, described him as a "short chubby Asian." Another witness at the scene, Mai Lor, told the police the offenders were Asian. Simmons told the police they were either Hmong or Chinese. Another witness, Nancy Lee, recognized the offenders as Hmong, but she also referred to them as "two Asian boys." The consensus of what the witnesses told the police was that the offenders were Asian males. All the individuals in the display are males of Asian descent and, although not exact clones,

bear a general physical resemblance to appellant. *Cf. United States v. Briley,* 726 F.2d 1301, 1306 (8th Cir.1984) (determining that identification procedures were not unnecessarily suggestive where people in display had complexions fairly resembling appellant regardless of race but appellant was only African American person in display); *Seelye,* 429 N.W.2d at 673 (concluding photographic display was not unnecessarily suggestive where appellant was Indian and other persons in display, who bore physical resemblance to appellant, were Caucasian). Based on the information given to the police and the testimony at trial concerning the method used to prepare the display, we conclude that the display does not single out appellant on the basis of race.

■ Appellant's second argument is that the display was unnecessarily suggestive because he was one of four persons in the display with jail clothing. This argument also lacks merit. Initially, it should be noted that there is nothing about the clothing worn by appellant and three other men in the display to suggest that it was jail clothing. They were all wearing gray over shirts and T-shirts, and the pictures were primarily of the individuals' faces, with only a small part of their collars showing. *See State v. Trimble,* 371 N.W.2d 921, 924 (Minn.App.1985) (recognizing that even orange clothing does not necessarily suggest jail clothing), *review denied* (Minn. Oct. 11, 1985). Perhaps persons with a sophisticated knowledge of the criminal justice system would instantly recognize appellant's clothing as jail clothing. There is nothing in the record, however, to suggest that appellant's dress influenced the witnesses in this case to identify him as the shooter. Moreover, it is even less likely that the display was unnecessarily suggestive because four out of the six individuals in the display, in-

cluding appellant, were wearing similar jail clothing. Appellant fails to explain why the fact that three other men in the display appear in the same clothing as appellant caused the display to impermissibly suggest that he was the shooter. Finally, although fairness dictates that all individuals in a photographic display should be wearing similar clothing, a defendant is not denied due process if all individuals are not so dressed. *See State v. Duncan*, 312 Minn. 17, 22, 250 N.W.2d 189, 193–94 (1977) (recognizing that lineup "fell short of the ideal, * * * [but] it did not result in a denial of due process" where defendant and one other individual were dressed in jail clothing while four others were dressed in street clothing).

We have examined the photographic display, and we conclude that the district court was well within its discretion when it ruled that the display was not impermissibly suggestive. Accordingly, the district court did not err when it denied appellant's motion to suppress evidence identifying him as the shooter.

## B. Photographs of Appellant

■ Appellant argues that the district court erred by admitting photographs of him. One photograph, taken in 1993, showed appellant wearing a baseball cap backwards and the other, taken in 1996, showed him wearing a bandana. Appellant asserts that the photographs were prejudicial and had no probative value.

■ Photographs must be relevant to a material issue in order to be admissible at trial. *State v. Daniels*, 361 N.W.2d 819, 828 (Minn.1985).

Identification of the shooter was a material issue at trial. Three of the state's witnesses testified that appellant was wearing something on his head on the day of the incident. Two testified that appellant was wearing a bandana and one testified that he was wearing a baseball cap turned backwards. Appellant's attorney questioned appellant's family and appellant regarding his use of headgear. Appellant's family and appellant testified that appellant had not worn a bandana since sometime before 1996 and that appellant always wore his baseball cap with the bill facing toward the front.

Contrary to appellant's claim, there is nothing inherently prejudicial about the photographs; they are simply snapshots of the appellant. Because the testimony of appellant and his family suggested that he did not wear bandanas or baseball caps with the bill facing backwards, the photographs were probative on this issue. Appellant's argument relating to the age of the photographs goes to their weight. The district court determined that the photographs were proper rebuttal evidence and that they did not prejudice the jury. Accordingly, we conclude the district court did not abuse its discretion by admitting the photographs.

## C. Interpreter

■ Appellant argues that the district court erred by denying his request for an interpreter for Tin Yang, appellant's father and one of his alibi witnesses, because Tin Yang had difficulty understanding some of the questions being posed to him at trial.

The district court shall appoint an interpreter for any "witness handicapped in communication." Minn.Stat. § 611.32, subd. 1 (2000). A person is handicapped in communication if,

> because of difficulty in speaking or comprehending the English language, [the person] cannot fully understand the proceedings * * * against the person, * * * or is incapable of presenting or

assisting in the presentation of a defense.

Minn.Stat. § 611.31 (2000).

 Once a witness begins to testify without an interpreter, the question of whether an interpreter is needed must rest in the broad discretion of the district court. Many of the indicators as to whether an interpreter is needed are nonverbal and may not appear in the record; such things as mispronunciations, pauses, facial expressions, and gestures. The district court must have broad discretion based on its first-hand view of these indicators.

Tin Yang testified at the Rasmussen hearing without an interpreter. At trial, before Tin Yang began his testimony, appellant's attorney specifically told him, "If there is anything I ask you that you don't understand, tell us you don't understand it and we'll say it differently, okay?" Tin Yang replied, "Yes." Appellant's attorney did not request an interpreter for Tin Yang until after the state completed its cross-examination. When the court asked Tin Yang if he wanted an interpreter, he replied, "If they can have someone help me, that would be better. But you are the Honor. If you don't want that, I don't—." After hearing arguments from both attorneys, the district court instructed Tin Yang that he could let the court know if he did not understand a question so that counsel could rephrase it in clearer language, and Tin Yang's examination continued without an interpreter.

A review of Tin Yang's testimony does not demonstrate that he had difficulty speaking or comprehending the English language. During direct examination, he seemed to understand appellant's attorney's questions and gave clear responses without asking for clarification. During cross-examination, Tin Yang did struggle with some of the questions, but the state's attorney rephrased each question in clearer language so that the witness could understand what was being asked. The district court reasoned that any problems Tin Yang had were from a lack of understanding of questions using idioms and double negatives, and this reasoning is supported by the transcript. Further, Tin Yang testified that he and his family have been living in the United States for about 23 years, he attended North Hennepin Community College, he had worked for the Minneapolis Community Development Agency, and he currently works as a housing inspector for the City of Minneapolis.

Tin Yang was called by appellant, who did not ask for an interpreter until after the state completed its cross-examination. We conclude that the district court's ruling on this issue was well within its broad discretion.

## D. Disclosure of Tape Recording

Appellant argues that the district court erred by allowing the state to introduce a taped telephone conversation between appellant and his wife while appellant was in jail. Appellant argues that the state did not properly disclose the tape, which deprived appellant of due process and a right to a fair trial.

The state has a duty to disclose relevant recorded statements "which relate to the case within the possession or control of the prosecution, the existence of which is known by the prosecuting attorney." Minn.R.Crim.P. 9.01, subd. 1(2). The state argues that the taped telephone conversation was rebuttal evidence so the disclosure rules do not apply. Appellant, however, contends that "due process must require disclosure of any possibly exculpatory evidence, even if used for rebuttal." In making this argument, appellant relies on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

A *Brady* disclosure only applies to material evidence; that is, evidence that, had it been disclosed to the defense, would have created a reasonable probability that the result of the proceeding would have been different. *State v. Hunt*, 615 N.W.2d 294, 299 (Minn.2000). The three components for determining if the state's failure to disclose evidence constituted a *Brady* violation are:

> [t]he evidence at issue must be *favorable* to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Id.* (emphasis added) (quotation omitted).

Appellant has provided no evidence that the taped telephone conversation would have been favorable to him, thus he has not satisfied the first component of the *Brady* analysis. Also, the state timely disclosed the tape. The taped conversation took place on November 4, 1999. The prosecuting attorney stated that he was not made aware of the tape until the evening of November 29, 1999, and he disclosed it to appellant the next morning before trial began for the day. Because the prosecuting attorney disclosed the tape soon after he became aware of it, there is no basis to conclude that the state attempted to circumvent any discovery rules. Based on the applicable disclosure rules, the district court did not err by concluding that the state timely disclosed the tape. Thus, appellant's argument under *Brady* fails.

Further, the district court determined that the taped telephone conversation was proper rebuttal evidence. Rebuttal evidence generally "consists of that which explains, contradicts, or refutes the defendant's evidence." *State v. Swanson*, 498 N.W.2d 435, 440 (Minn.1993) (citation omitted). The determination of what constitutes proper rebuttal evidence rests almost entirely in the discretion of the district court. *State v. Brown*, 500 N.W.2d 784, 788 (Minn.1993). Disclosure rules do not apply to rebuttal evidence. *Cf. State v. Anderson*, 405 N.W.2d 527, 531 (Minn.App. 1987) (concluding state does not have duty to disclose rebuttal witness), *review denied* (Minn. July 22, 1987).

The district court did not abuse its discretion by ruling that the taped telephone conversation constituted rebuttal evidence. Appellant's wife testified that appellant was with her the night of the shooting. During the taped conversation, however, appellant asked, "What do you want me to do? Go in there and tell them I did it? What do you want me to do?" Appellant's wife responded, "Well did you do it?" Appellant replied, "Answer me." Appellant's wife asked, "What did you do? If you did it then why the hell you gonna say it, stupid." The taped conversation conflicts with appellant's wife's testimony that appellant was with her on the night of the shooting. Accordingly, the district court did not err in concluding that the taped telephone conversation was proper rebuttal evidence. We note, however, that our ruling only applies to genuine rebuttal evidence. Parties are cautioned not to attempt to inappropriately fail to disclose evidence by classifying it as rebuttal evidence.

### III. Prosecutorial Misconduct

Appellant argues that the prosecutor committed misconduct by commenting on the credibility of the state's witnesses, misstating the evidence, inflaming the jury's passions, and denigrating appellant's witnesses. Because of the alleged misconduct, appellant contends he should be granted a new trial.

■ The determination of whether a new trial should be granted because of prosecutorial misconduct rests within the discretion of the district court. *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn. 1980). When assessing such a claim, the reviewing court must first determine whether the conduct was in fact misconduct, and, if the court so concludes, then a two-tiered test is applied. *State v. Washington*, 521 N.W.2d 35, 39–40 (Minn.1994). If the reviewing court determines the prosecutor committed unusually serious prosecutorial misconduct, the conviction may be affirmed only if the misconduct was harmless beyond a reasonable doubt. *State v. Caron*, 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974). Where the conduct is less serious, the test is "whether the misconduct likely played a substantial part in influencing the jury to convict." *Id.* at 128, 218 N.W.2d at 200. The prosecutor's statements must be taken as a whole when determining if there is a basis for reversing appellant's conviction. *Washington*, 521 N.W.2d at 40.

■ A defendant has a duty to promptly object or seek curative instructions if a prosecutor makes an improper statement during closing argument. *State v. Brown*, 348 N.W.2d 743, 747 (Minn. 1984). Generally, a defendant who fails to object or seek curative instructions has waived the right to raise the issue on appeal. *Rairdon v. State*, 557 N.W.2d 318, 323 (Minn.1996).

■ Here, appellant did not object to the prosecutor's allegedly improper comments, nor did he seek a curative instruction. Because appellant failed to object or seek a curative instruction, this court reviews the claim under the plain error rule, under which we ask whether the alleged conduct was

so clearly erroneous under applicable law and so prejudicial to the defendant's right to a fair trial that the defendant's right to a remedy should not be forfeited.

*State v. Hunt*, 615 N.W.2d 294, 302 (Minn. 2000) (citation omitted). Additionally, a conviction may also be reversed prophylactically or in the interests of justice when a prosecutor persists in committing misconduct. *State v. Salitros*, 499 N.W.2d 815, 820 (Minn.1993).

We conclude that the prosecutor misstated certain evidence, which will be discussed below. Otherwise, we conclude that the prosecutor did not commit misconduct.

### A. Credibility of the State's Witnesses

Appellant asserts that the prosecuting attorney improperly vouched for the state's witnesses in three instances during closing argument. First, the prosecuting attorney stated:

You think for one minute [the detectives] are going to come in on a case with a lineup that's going to single somebody out and be that obvious? And ruin an investigation? I submit to you, no they are not.

Second, regarding appellant's testimony, which conflicted with the officers' testimony, the prosecuting attorney stated:

Now, these are officers who are trained in observation. They are officers trained in writing things down, because they have to generate reports about what they find and what they learn.

Third, regarding Tin Yang's testimony, which conflicted with the officers' testimony, the prosecuting attorney stated:

Now, these are again police [who] are writing things down to get it accurate. [Tin Yang] never said that [his son left at 5:30 p.m. to go to his father-in-law's house].

* * * *

[Police officers] are authorized to make the type of searches that they did by a District Court judge. That they write things down when they see them so that they can remember * * * what people said to them, what they saw and so forth.

And the police officers, their stock and trade is to come into court and put their credibility on the line. And you really think that they are going to jeopardize their careers by coming in here and lying? I submit to you no. For one case, a whole career? Doesn't make sense.

 The prosecuting attorney has a right to argue that the state's witnesses were worthy of credibility. *State v. Goggins*, 255 N.W.2d 805, 806 (Minn.1977). But, the prosecuting attorney may not express a personal opinion about the witnesses' credibility. *State v. Porter*, 526 N.W.2d 359, 364 (Minn.1995).

 Viewing these comments in light of the prosecuting attorney's entire argument, we conclude that the prosecuting attorney was attempting to explain how investigators perform their job and why they are trained to document accurately all information discovered during an investigation. It does not appear that the prosecuting attorney personally endorsed the witnesses; rather, the prosecuting attorney showed that because of their training and experience, the officers were worthy of credibility. Therefore, we fail to see how the prosecuting attorney impermissibly vouched for the state's witnesses.

## B. Misstatement of the Evidence

 Appellant argues that the prosecuting attorney misstated the evidence during closing argument by stating that "five people identified this defendant as

one of the murderers at Wafana's store," and by describing the police department's database, which contains photographs of individuals who have been arrested that are used to create photographic displays, as "[linking] the defendant to the crime."

These comments do appear to be misstatements of the evidence. Only three witnesses identified appellant as the shooter. A more accurate statement of the evidence is that five witnesses placed appellant at the scene on the day of the incident. Also, the police department's computer database did not link appellant to the crime. But, when viewed in context of the entire closing argument, this comment seems to be explaining how the computer system creates a photographic display based on appellant's characteristics, which can then be shown to the witnesses of the incident. The prosecuting attorney explained how the photographic display became the test for the witnesses and that five witnesses passed the test by identifying appellant. Viewing these comments in light of the prosecuting attorney's entire argument, even if the comments were improper, they do not rise to the level of plain error and were not so prejudicial to appellant that a reversal is warranted.

## C. Inflaming the Jury's Passions

 Appellant argues that the prosecuting attorney attempted to turn the jury against him by stating during closing argument that

the significance of finding marijuana seeds is that there is evidence in the defendant's truck of what the defendant essentially killed someone for, this marijuana, or not getting it.

 A proper closing argument should focus on the evidence and reasonable inferences drawn from the evidence. *State v. DeWald*, 463 N.W.2d 741, 744 (Minn.1990). A prosecutor "should not use arguments

calculated to inflame the passions or prejudices of the jury." *Salitros*, 499 N.W.2d at 817 (quotation omitted).

In this case, evidence was admitted at trial establishing that appellant had given Dominic McElroy $60 to purchase marijuana for appellant. On the day of the incident, McElroy and appellant drove around in appellant's vehicle searching for marijuana to purchase. After their unsuccessful search, McElroy kept appellant's money without delivering any marijuana. Campbell testified that appellant approached him and Miguel looking for Dominic and/or his money. Accordingly, the prosecuting attorney's statement was a reasonable inference based on the evidence, tying appellant to the shooting and showing that he had a motive. It was not an improper comment intended to inflame the jury's passion. *See State v. Rose*, 353 N.W.2d 565, 569 (Minn.App.1984) (concluding where record established that 13–year–old rape victim suffered and will continue to suffer long-lasting mental anguish, prosecuting attorney's argument pertaining to her mental anguish was fair comment on evidence), *review denied* (Minn. Sept. 12, 1984).

### D. Credibility of Defense Witnesses

Appellant argues that the prosecuting attorney improperly denigrated the defense witnesses by pointing out that they could have come forward earlier to provide information regarding appellant's alibi, by commenting on Tin Yang's desire to have an attorney present when he spoke with the police and appellant's wife's unwillingness to give a taped statement, and by questioning Tin Yang's reasoning for exercising his right to require a search warrant before he allowed police to search his home.

 A prosecuting attorney may attack the merit of a particular defense or argument in light of the evidence, but may not belittle a defense in the abstract. *State v. Williams*, 525 N.W.2d 538, 549 (Minn.1994). Further, a prosecuting attorney may point to circumstances that cast doubt on a witness's veracity as long as the prosecuting attorney does not inject personal opinion. *State v. Ture*, 353 N.W.2d 502, 516 (Minn.1984).

 Here, several of the prosecuting attorney's comments were attacking the credibility of appellant's alibi witnesses by pointing out their lack of timeliness in coming forward with alibi information. Such attacks on witness credibility are permissible. *See State v. Dupay*, 405 N.W.2d 444, 450 (Minn.App.1987) (concluding attack on timeliness of alibi defense is permissible attack on witness's credibility).

 The prosecuting attorney commented on Tin Yang's request to have an attorney present while talking to police and his desire for the police to secure a search warrant before searching his home. The prosecuting attorney argued that Tin Yang's actions created a window of opportunity for appellant to get rid of the gun and the clothes; these are permissible inferences based on the evidence. Three witnesses identified appellant as the shooter. Several days passed before police could search appellant's home. There was an adequate window of opportunity for appellant to get rid of the gun and any other evidence linking him to the shooting.

 The prosecuting attorney's theory regarding whether appellant's alibi was legitimate is also a permissible inference. The prosecuting attorney stated:

I submit to you what's happened here is an exercise in the power of suggestion. * * * I think what's happened here is family keeping things together, let's not disappoint each other. Start thinking back. * * * You know, we visit. And

that becomes we visit on a regular basis. And that becomes we have been over on a Friday before, it becomes every Friday.

A number of alibi witnesses were from appellant's family. The prosecutor was commenting on their possible bias in favor of appellant.

In addition, the district court adequately instructed the jury that the closing statements were presented for purposes of argument only and that the jury was to rely on its own recollection of the facts. *But see Porter*, 526 N.W.2d at 365 (stating district court's curative instruction did not fully address prosecuting attorney's misconduct, therefore it could not undo damage done by prosecuting attorney's comments).

Based on the record before us, we conclude that none of the prosecuting attorney's comments rose to the level of misconduct. Reaching a contrary result based on appellant's rationale would make it misconduct any time a prosecuting attorney makes any negative statement about the defense. Such a result is illogical and contrary to the applicable caselaw.

## IV. New Evidence

### A. Reopening Case After Jury Began Deliberations

■ Appellant asserts that the district court erred by refusing to reopen the case after the jury deliberations had begun so that appellant could present new evidence pertaining to his defense. Specifically, appellant argues that the jury should have been allowed to hear evidence that Simmons recanted his testimony. Appellant contends that the jury should have been able to hear and weigh this evidence before reaching its verdict.

A review of Minnesota caselaw fails to reveal any criminal case discussing the issue of whether the district court may reopen a case to receive additional evidence after the jury has begun its deliberations. The United States Supreme Court has stated that the district court's discretion to allow additional evidence after jury deliberations have begun is very limited because providing such evidence would likely distort the evidence's importance. *United States v. Bayer*, 331 U.S. 532, 537–38, 67 S.Ct. 1394, 1396–97, 91 L.Ed. 1654 (1947). Further, it is not reversible error to refuse to admit "unsworn, unverified" evidence after the case had been submitted to the jury. *Id.* at 539, 67 S.Ct. at 1397.

The Maryland Court of Appeals discussed at length the issue of whether the district court may allow a party to introduce evidence after the jury has begun its deliberations. *Dyson v. State*, 328 Md. 490, 615 A.2d 1182 (1992). After discussing a multitude of other state's caselaw as well as federal caselaw on point, the court counseled that reopening a case "must be done in a way that does not unduly prejudice the rights of any party." *Id.* at 504, 615 A.2d at 1189 (citation omitted). The court reasoned that the district court "must exercise the utmost caution in reopening a case to allow the introduction of additional evidence after the jury has begun deliberating." *Id.* at 502–03, 615 A.2d at 1188. The court concluded that allowing additional evidence, where there is no extraordinary reason to do so, and without permitting cross-examination of the witness supplying the additional evidence, warrants a reversal of the conviction. *Id.* at 504–06, 615 A.2d at 1189. But, the court noted that reversal may not be necessary if the district court permits cross-examination. *Id.* at 504, 615 A.2d at 1189.

Here, Simmons testified at trial that he observed appellant at Wafana's talking to Campbell and Miguel. He then saw appellant pull out a gun and shoot them. Short-

ly after the jury began its deliberations, appellant requested a hearing to inquire whether Simmons had made a statement indicating that he knew appellant had not committed the crime. At the hearing, Deputy Danyelle Becking testified that she heard Simmons say to appellant, "No, man, and it wasn't you. It wasn't you. I heard they are trying to give you 30 years." According to appellant's testimony, Simmons told appellant that

> [T]hey made me say it. They made me come in and testify. I didn't want to. But they made me come in and testify. No, you are not the guy that did it. I know you are not the guy.

Deputy Becking was recalled and testified that she did not hear this portion of the conversation. At the hearing, Simmons invoked his Fifth Amendment privilege and did not testify.

Subsequently, at the hearing on appellant's motion for a new trial, after being granted immunity, Simmons agreed to testify. Although Simmons testified that he told another inmate in the holding cell, "I don't know if [appellant] is the killer," he further testified that, after reading the trial transcript of his original testimony, he would not significantly change any of his testimony. Simmons explained that he made the statement because, to him, many Asians look alike. Simmons did not indicate that he was forced to testify at trial against appellant or that he was unsure that appellant was the shooter. Simmons did not change his story until he met appellant face-to-face in the holding cell and was left alone with him, and he told the court that he did not feel comfortable being in such close proximity with appellant. In fact, Simmons testified that he heard from other inmates that appellant had called him a "snitch" and that he was "going to get dealt with."

It is our conclusion that the district court did not abuse its discretion in refusing to reopen the testimony while the jury was deliberating. As long as Simmons was invoking his Fifth Amendment privilege, the state would be denied the opportunity of cross-examining him in front of the jury. This would prejudice the state, and the jury might well have given Deputy Becking's testimony undue weight. Moreover, as discussed more fully below, at the motion for a new trial, the district court found that Simmons's recantation was not genuine. Thus, albeit after the fact, Simmons's testimony at the motion for a new trial ultimately supports the district court's decision not to reopen the case after the jury had begun deliberating. We therefore affirm the district court on this issue.

## B. New Trial

Appellant argues that the district court should have granted his motion for a new trial because Simmons recanted his earlier testimony.

■ The decision whether to grant a new trial based on a material witness's recantation rests within the district court's discretion, and the court's decision will not be disturbed absent a clear abuse of discretion. *Daniels*, 447 N.W.2d at 188. Traditionally, courts have "looked with disfavor on motions for a new trial based on recantations unless extraordinary or unusual circumstances exist." *Id.* (citation omitted). A defendant should be given a new trial based on recantation of a material witness's testimony if the defendant shows that

> 1) the testimony was false; 2) [the defendant] was surprised by the testimony and was unable to counteract it or did not know it was false until after the trial; and 3) the jury might have

reached a different conclusion if it had not considered the false testimony.

*Flournoy v. State,* 583 N.W.2d 564, 569 (Minn.1998) (citation omitted). If the district court finds that the recantation was not genuine, it "does not even need to proceed to the issue of whether the jury might have reached a different result without the witness' testimony." *State v. Bowles,* 530 N.W.2d 521, 534 (Minn.1995) (quotation omitted).

■ As we previously noted, the district court found that Simmons's recantation was not genuine. This determination is well within the district court's discretion. The district court reasoned, based on its observation of Simmons in the courtroom at least three to four times, that Simmons was the type of person who said what people wanted to hear. The court further reasoned that Simmons was intimidated by appellant and that his recantation was merely a product of being in the same holding cell with appellant. The court pointed out that Simmons gave his original statement shortly after the incident occurred, he identified appellant in a photographic display, and he testified "at length under oath at trial." Based on these facts, we conclude that the district court did not abuse its discretion when it found that Simmons's recantation was not genuine. Because appellant has failed to show that Simmons's testimony was false, appellant has failed to meet the burden set forth in *Flournoy.* Accordingly, we conclude that the district court was well within its discretion when it denied appellant's motion for a new trial.

## DECISION

The evidence was sufficient to sustain appellant's conviction despite minor inconsistencies between the witnesses' identifications. The district court did not abuse its discretion by (1) admitting the photographic display even though appellant was the only Hmong individual and was one of four individuals featured in jail clothing; (2) admitting photographs addressing the issue of appellant's appearance; (3) denying appellant's request for an interpreter for one of his witnesses where the witness was called by appellant, who did not request an interpreter until after the state completed its cross-examination; and (4) admitting appellant's taped telephone conversation as rebuttal evidence that contradicted the testimony of one of appellant's witnesses. Further, it is not prosecutorial misconduct for the state to argue that its witnesses are credible, to comment on reasonable inferences based on record evidence, to attack the timeliness of appellant's alibi, and to comment on the possibility of bias of appellant's alibi witnesses. In addition, any minor misstatements of evidence by the state do not warrant reversal. Finally, the district court did not abuse its discretion by refusing to reopen the case after the jury had begun its deliberations or denying appellant's motion for a new trial because of a witness's alleged recantation.

**Affirmed.**