*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0178**

State of Minnesota,
Respondent,

vs.

Joshua Lee Littlewolf,
Appellant.

**Filed June 1, 2015
Affirmed
Johnson, Judge**

St. Louis County District Court
File No. 69DU-CR-12-1415

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, St. Paul, Minnesota; and

Mark S. Rubin, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Suzanne M. Senecal-Hill, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Halbrooks, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

A St. Louis County jury found Joshua Lee Littlewolf guilty of second-degree murder based on evidence that he used a kitchen knife to cut a man's throat. On appeal,

Littlewolf challenges the sufficiency of the evidence and contends that another person caused the man's death. We conclude that the evidence is sufficient to support the conviction and, therefore, affirm.

**FACTS**

Littlewolf's conviction arises from the murder of Joshua Olson, who was found dead in a Duluth apartment the morning after a party.

In April 2012, N.B. moved into a third-floor efficiency apartment in a multi-unit building in Duluth. On the evening of April 26, 2012, several people gathered in his apartment. Guests came and went during the party; Littlewolf and Olson were among them. Most of the guests were only vaguely familiar to N.B. and were invited off the street to take respite from cold weather. Throughout the night, the guests drank heavily. By midnight, only four people remained in the apartment: N.B., S.W., Littlewolf, and Olson. The apartment building's surveillance cameras showed that Littlewolf left the building at 3:08 a.m.

The following morning, S.W. awoke first, before 8:00 a.m. She saw a man lying on the floor next to a blood-smeared wall. She tapped him, and when he did not respond, she "had this feeling like something is not right." She departed and went to a homeless shelter. She testified that she tried to report what she saw but that no one listened to her.

N.B. awoke at approximately 8:30 a.m. and also observed a man lying on the floor next to a wall. N.B. assumed that the man was passed out and tried to wake him but received no response. N.B. noticed blood on the man's back, in the man's hair, and on the floor. N.B. called 911 and reported that someone had killed himself in his apartment.

2

He mistakenly identified the dead man as John. Investigators arrived and found a large gash across Olson's throat.

Investigators initially suspected N.B. but soon switched their focus to Littlewolf. Police arrested Littlewolf in St. Cloud on May 2, 2012. During an interview with police officers, Littlewolf provided extensive information that was internally inconsistent but generally incriminating. He initially stated that he could not remember whether he was in Duluth on April 26 and denied any knowledge of the murder. He later admitted that he was in N.B.'s apartment during the party but said that the party was peaceful and that he left between midnight and 1:00 a.m. He later admitted that he fought with Olson after Olson insulted Native American culture. Littlewolf admitted that he swung a knife at Olson, lodging it in his throat, and that he then pushed Olson against a wall, causing him to fall to the floor. Littlewolf said that when he left the apartment, the knife was still stuck in Olson's throat.

The state charged Littlewolf with second-degree murder, in violation of Minn. Stat. § 609.19, subd. 1(1) (2010), and second-degree assault, in violation of Minn. Stat. § 609.222, subd. 1 (2010). Before trial, the state dismissed the assault charge.

The case was tried to a jury over 11 days in September 2013. Littlewolf represented himself, with the assistance of advisory counsel. The state called 23 witnesses. The state's medical experts testified that Olson's death was caused by multiple, deep lacerations to his throat, which left a gaping wound and severed his airway and multiple blood vessels. The evidence of blood spatter and blood pooling indicated that the victim was attacked while he was on the ground. The medical examiner

3

estimated the time of death to be between 2:00 and 3:00 a.m. As stated above, a video-recording showed Littlewolf exiting the building at 3:08 a.m. Investigators found some of Littlewolf's discarded clothing in the bathroom of a gas station, and the clothing bore drops of Olson's blood, with a spatter pattern that was consistent with the pattern found on the wall near where Olson's body was found.

Witnesses who attended the party testified about what happened in the apartment that night. N.B. testified that he fell asleep on a mattress on the floor at approximately 8:00 or 9:00 p.m. and did not remember who was in his apartment when he fell asleep. S.W. testified that Littlewolf and Olson "got into an incident" and that Littlewolf threatened Olson with a knife. She testified that Littlewolf had an angry expression on his face. She asked him to give her the knife. She said he "snapped out of it" and smiled and handed the knife to her. She then placed it in the sink, went to sleep, and did not see or hear any other fighting.

Residents of other apartments in the building testified to noises coming from N.B.'s apartment. One nearby resident testified that, at approximately 2:30 or 3:00 a.m., he heard loud noises in the apartment, followed by silence. Another nearby resident reported hearing moaning noises at approximately 3:15 a.m. That same resident heard a person crying and sounding "very distraught" and called the police twice during the night. Police officers knocked on the door to N.B.'s apartment at approximately 3:30 a.m. but, hearing no answer, did not enter.

An inmate of the county jail, B.G., testified that he was detained in a cell adjacent to Littlewolf's cell for two months before Littlewolf's trial. B.G. testified that he and

4

Littlewolf discussed the case daily, either through the vents between their cells or when they were detained in a larger holding unit. B.G. testified that Littlewolf told him that he grabbed a knife from the kitchen area of the studio apartment and "pretty much went to town on the guy." B.G. testified that Littlewolf stated that he "pretty much worked him over, beat him up." B.G. elaborated by saying: "He said he had the knife in his hand the whole time and he was just punching him, back and forth, just punching him . . . . [H]e said the guy didn't have a chance. He just pretty much 'balled up.'" B.G. testified that Littlewolf said that he told Olson during the attack, "I kill for this," referring to Olson's prior disrespectful statement about Native American culture. In addition, B.G. testified that Littlewolf described the way he used the knife: "[Littlewolf] said he tried to 'saw [Olson's] f---ing head off.' He said he tried to 'decapitate him,' pretty much. And those were his exact words." B.G. testified further that, while in jail, Littlewolf showed him autopsy photographs, pointed to the victim's "gaping" neck wound, and said, "This is how I get down, this is what I do." B.G. testified that Littlewolf "seemed to me like he was proud of what he was doing and what he had done."

Littlewolf testified in his own defense and called 13 witnesses. In his own testimony, he characterized Olson as racist and disrespectful. Littlewolf testified that he fought with Olson using his knowledge of martial arts. Littlewolf admitted in his testimony to cutting Olson with a knife but denied that he inflicted a fatal wound and claimed to have placed the knife on Olson's chest before leaving the apartment. Littlewolf also testified that N.B. attacked Olson earlier in the evening. Littlewolf maintained that N.B. was the person who caused Olson's death.

5

The jury found Littlewolf guilty. The district court imposed a sentence of 480 months of imprisonment. Littlewolf appeals.

## D E C I S I O N

Littlewolf argues that the evidence is insufficient to support his conviction of second-degree murder. To obtain a conviction of second-degree murder, "the state must show that the defendant 'cause[d] the death of a human being . . . with intent but without premeditation.'" *State v. Bauer*, 598 N.W.2d 352, 370 (Minn. 1999) (alteration in original) (quoting Minn. Stat. § 609.19, subd. 1(1)). Littlewolf does not appear to challenge the evidence of intent or causation; he contends merely that another person inflicted the injuries that caused Olson's death.

### A.

As an initial matter, we must determine the applicable standard of review. Ordinarily, when reviewing the sufficiency of the evidence, we undertake "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient" to support the conviction. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). We seek to "determine whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Salyers*, 858 N.W.2d 156, 160 (Minn. 2015) (quotation omitted). We "assume that the factfinder disbelieved any testimony conflicting with the verdict." *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011) (quotation omitted). "We will not disturb the verdict if the jury, acting with due regard

6

for the presumption of innocence" and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the crime charged. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004) (quotation omitted).

If circumstantial evidence is necessary to support a conviction, however, we apply a different standard of review. *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). In such a case, "The first step is to identify the circumstances proved" and "assume that the jury resolved any factual disputes in a manner that is consistent with the jury's verdict." *Id.* (citing *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010)). The second step is to "examine independently the reasonableness of the inferences that might be drawn from the circumstances proved," and then "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted). The reviewing court must consider the evidence as a whole and not examine each piece in isolation. *Andersen*, 784 N.W.2d at 332.

To determine whether to apply the traditional standard of review or the circumstantial-evidence standard of review, we ask whether the state's direct evidence is sufficient to prove each element of the crime. *See, e.g.*, *State v. Flowers*, 788 N.W.2d 120, 133 n.2 (Minn. 2010).[1] If the state's direct evidence, by itself, is sufficient to prove

---

[1]In *Flowers*, the supreme court applied the traditional standard of review because "[t]he State presented direct evidence on each element of the offense." 788 N.W.2d at 133 n.2. In other cases, the supreme court has applied the circumstantial-evidence standard of review. *See State v. Silvernail*, 831 N.W.2d 594, 602-03 (Minn. 2013) (Stras, J., concurring) (citing cases). In those other cases, however, the appellants challenged the state's evidence of the defendant's state of mind, such as premeditation or intent to kill. *See State v. Boldman*, 813 N.W.2d 102, 107 (Minn. 2012); *Ortega*, 813 N.W.2d at 100; *Palmer*, 803 N.W.2d at 733; *State v. Moore*, 481 N.W.2d 355, 360 (Minn. 1992). A

7

each element of the charged offense, we apply the traditional standard of review; but if the state's direct evidence, by itself, is insufficient to prove each element of the charged offense, and the state also relies on circumstantial evidence to prove one or more elements, we apply the circumstantial-evidence standard of review. *State v. Porte*, 832 N.W.2d 303, 309 (Minn. App. 2013) (applying circumstantial-evidence standard of review because state introduced insufficient direct evidence of possession of requisite amount of controlled substance); *see also Salyers*, 858 N.W.2d at 161 (applying traditional standard of review because state introduced sufficient direct evidence of possession of firearm); *State v. Sam*, 859 N.W.2d 825, 832 (Minn. App. 2015) (applying circumstantial-evidence standard of review because state did not introduce direct evidence of possession of firearm or controlled substance). Direct evidence is "'evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption,'" while circumstantial evidence is "'evidence based on inference and not on personal knowledge or observation.'" *Bernhardt*, 684 N.W.2d at 477 n.11 (alterations omitted) (quoting *Black's Law Dictionary* 595-96 (8th ed. 2004)).

Littlewolf contends that the circumstantial-evidence standard of review applies. In response, the state contends that the traditional standard of review applies because it

---

defendant's state of mind usually must be proved by circumstantial evidence. *State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000). Indeed, the supreme court recently stated, "It is rare for the State to establish a defendant's state of mind through direct evidence." *State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015). In *Flowers*, however, the supreme court analyzed the sufficiency of the evidence of the appellant's conduct, not his state of mind. *See* 788 N.W.2d at 133-34. The same is true in this appeal. Accordingly, *Flowers* provides the most helpful guidance concerning the selection of the applicable standard of review.

presented sufficient direct evidence to sustain the conviction. In cases in which the main issue is the identity of the person who committed a crime, circumstantial evidence sometimes is necessary to sustain a conviction. *See, e.g.*, *Andersen*, 784 N.W.2d at 331 (relying on circumstantial evidence to establish identity); *Bauer*, 598 N.W.2d at 370 (relying on both direct evidence and circumstantial evidence to establish identity); *State v. Yang*, 627 N.W.2d 666, 672 (Minn. App. 2001) (relying solely on direct evidence to establish identity), *review denied* (Minn. July 24, 2001). In this case, the state introduced evidence that Littlewolf confessed to committing the crime. A confession is direct evidence of guilt. *State v. Weber*, 272 Minn. 243, 254, 137 N.W.2d 527, 535 (1965); *State v. McClain*, 208 Minn. 91, 95-96, 292 N.W. 753, 755 (1940); *State v. Battin*, 474 N.W.2d 427, 430 (Minn. App. 1991), *review denied* (Minn. Oct. 23, 1991). Thus, if a defendant has confessed to conduct that satisfies each element of the charged offense, the confession is direct evidence that may be sufficient to sustain the conviction. Accordingly, we will begin our analysis by applying the traditional standard of review to the state's direct evidence.

**B.**

The direct evidence of the identity of Olson's killer includes Littlewolf's confession to another inmate at the county jail. To reiterate, B.G. testified that Littlewolf told him that he beat Olson and used a kitchen knife to cut his neck in a manner that resembled a decapitation. Littlewolf's statements to B.G., if assumed to be true, plainly are sufficient to prove that he was the person who killed Olson. *See State v. Heiges*, 779 N.W.2d 904, 912 (Minn. App. 2010) (concluding that trustworthy confession was

9

sufficient to support conviction) (citing *Smith v. United States*, 348 U.S. 147, 156, 75 S. Ct. 194, 199 (1954)), *aff'd*, 806 N.W.2d 1 (Minn. 2011).

Littlewolf contends that this court should disregard his confession to B.G., for two reasons. First, Littlewolf contends that his confession to B.G. does not support the verdict because the state "did not even mention [B.G.'s] testimony in its closing argument." This contention is contrary to the record. In closing argument, the prosecutor referred to B.G.'s testimony by stating that Littlewolf bragged about the murder and was "[p]roud to report that Joshua Olson simply balled up while Mr. Littlewolf went to town trying to saw off his head." That portion of the closing argument plainly is a reference to B.G.'s testimony. In any event, Littlewolf's contention is contrary to the caselaw. We assess the sufficiency of the evidence by reviewing the entire record. *See Ortega*, 813 N.W.2d at 100. Accordingly, the jurors were free to rely on any evidence in the trial record, regardless whether the prosecutor referred to the evidence in closing argument.

Second, Littlewolf contends that B.G. is unreliable because he is a "jailhouse snitch." Littlewolf has cited no caselaw stating that an appellate court should disregard the testimony of jailhouse informants when analyzing the sufficiency of the evidence. As a general rule, "it is well-settled in Minnesota that it is the province of the jury to determine the credibility and weight to be given to the testimony of any individual witness." *State v. Engholm*, 290 N.W.2d 780, 784 (Minn. 1980). We are not aware of any exception to this general rule for the testimony of jailhouse informants. Even if a jailhouse informant's credibility is "seriously called into question," we will not disturb a jury's credibility determination. *See State v. Pippitt*, 645 N.W.2d 87, 94 (Minn. 2002)

(reasoning that jurors were free to weigh credibility of informant despite questions about his motivation and his multiple prior convictions).  The jury was presented with evidence that could have cast doubt on B.G.'s credibility.  For example, Littlewolf introduced into evidence a two-page letter that B.G. wrote to the prosecutor, asking for a plea agreement on pending criminal charges.  We must respect the jury's ability to assess B.G.'s credibility.

In light of B.G.'s testimony about Littlewolf's confession, the state's direct evidence is sufficient to support the conviction.  For that reason, we need not consider the state's circumstantial evidence and need not apply the circumstantial-evidence standard of review.  We note, however, that the state's evidence of the identity of Olson's killer also includes Littlewolf's self-incriminating trial testimony.  Littlewolf admitted on the witness stand that he stabbed Olson in the neck with a knife, though he denied causing Olson's death.  Although Littlewolf's admissions likely damaged his defense, they do not amount to a confession to the charged offense because he denied causing Olson's death.  *See* Minn. Stat. § 609.19, subd. 1(1); *Bauer*, 598 N.W.2d at 370.  Nonetheless, they provide strong circumstantial evidence of Littlewolf's guilt.  This is especially so in light of the testimony of the medical examiner, who testified that Olson died because of the large wound on his neck, and the evidence about the nature of the harm inflicted on Olson.  *See State v. Moore*, 481 N.W.2d 355, 361 (Minn. 1992) (reasoning that intent to kill may be inferred from nature and manner of killing).  If we were to conduct an analysis of this part of the state's circumstantial evidence, we would assume that the jury disbelieved any evidence that is contrary to the verdict.  *See Palmer*, 803 N.W.2d at 733.

In that event, we would respect the jury's freedom to accept the inculpatory aspects of Littlewolf's testimony and reject the exculpatory aspects of his testimony. *Ortega*, 813 N.W.2d at 100. In light of the entire record, Littlewolf's admission that he stabbed Olson in the neck with a knife is "consistent with [his] guilt and inconsistent with any rational hypothesis except that of guilt." *See Andersen*, 784 N.W.2d at 330. Thus, Littlewolf's testimony corroborates the state's direct evidence and supports the conclusion that Littlewolf killed Olson.

In sum, the evidence is sufficient to support Littlewolf's conviction of second-degree murder.

**Affirmed.**